# CARROLL *v.* PARRY.

EVIDENCE; TELEPHONE CONVERSATION; POLICE BLOTTER; FALSE ARREST; QUESTIONS FOR THE JURY.

1. In an action for false arrest against former employers of the plaintiff, it is error for the trial court to permit the father of the plaintiff, who was arrested on Saturday and confined in a station house, to testify that on that evening he was called by telephone from the office of his son's employers, and told that his son would be working late that evening, and that the next morning, on calling up the office and asking whether his son was still at work, a man's voice replied that he believed so; where the witness cannot identify the person who spoke to him, and there was nothing to indicate that it was either of the defendants.

2. An entry in the complaint book at a police station, showing the name of the party arrested and upon what charge and by whom the charge was made, is inadmissible in evidence in an action for false arrest, when the entry was not made by the defendant or in his presence or with his knowledge. (Following *Prigg* v. *Lansburgh*, 5 App. D. C. 30; *National Union* v. *Thomas*, 10 App. D. C. 277, and *Snell* v. *United States*, 16 App. D. C. 501.)

3. When, in an action for false arrest and imprisonment, the facts relied on to constitute probable cause are in dispute, their existence is for the determination of the jury, and their legal effect, if found to be true, is for the court. (Following *Spitzer* v. *Friedlander*, 14 App. D. C. 556; *Slater* v. *Taylor*, 31 App. D. C. 104; *United Cigar Stores Co.* v. *Young*, 36 App. D. C. 409; *Staples* v. *Johnson*, 25 App. D. C. 155, and *Mark* v. *Rich*, ante, 182.)

No. 2750. Submitted March 1, 1915. Decided March 29, 1915.

HEARING on an appeal by the defendants from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for false arrest and imprisonment.

*Reversed.*

*Evidence—Telephone Conversation.*—For cases passing upon the necessity and sufficiency of identification as a foundation for the admission of a conversation or communication by telephone. see note to *Planters' Cotton Oil Co.* v. *Western U. Teleg. Co.* 6 L.R.A. (N.S.) 1180.

The COURT in the opinion stated the facts as follows:

This is an action for false arrest and imprisonment brought by Jackson G. Parry, an infant, by his next friend, Richard L. Parry, against Harry R. Carroll and Louis D. Carroll, composing the Carroll Electric Company, charging in a declaration in three counts substantially that, for no reasonable or probable cause the defendants caused the plaintiff to be arrested upon the false charge of larceny, and caused the police officer to take the plaintiff under such arrest to Number 1 Precinct Station; and there detained for the space of two days, after which he was discharged from imprisonment. The plaintiff alleges he was brought into public scandal, infamy, and disgrace, and suffered and underwent great pain both of body and mind; claims $10,000 damages.

Defendants pleaded not guilty, and facts constituting probable cause for the arrest.

Plaintiff testified that he had lived in Washington all his life, and had been employed by defendants for ten months, and was in charge of their electrical supply store and store-room, receiving a salary of $40 per month. That the defendants were copartners. That on January 6, 1912, Detectives Springman and O'Brien brought Arthur Tyler, a colored driver employed by the defendants, into the defendants' store and took him upstairs; that later plaintiff was sent for, and upon arriving Louis D. Carroll, one of the defendants, asked Tyler if the plaintiff knew anything about the stealing of the defendants' cable from the warehouse. That Tyler replied "No, nothing at all."

Plaintiff was then asked how long it had been since he had been at the warehouse, and he said, "A month or so." "Q. You don't know anything about this colored fellow being crooked? A. No, sir." Plaintiff was then sent down stairs again. In about half an hour he was called upstairs again, and Louis Carroll asked the driver, Arthur Tyler, "Are you positively sure Mr. Jackson (meaning plaintiff) knew nothing of this affair?" Tyler answered "No, sir." The driver was asked again by Louis Carroll, "Are you sure?" and the driver replied "No, sir,

he doesn't know anything about it. Plaintiff then turned to Harry Carroll, and said, "Mr. Carroll, do you think I am guilty?" and Harry Carroll said, "I don't know," and plaintiff said, "Whoever says so is a liar," and Harry Carroll said "I will prove that." Plaintiff then went down stairs and resumed his duties. About 4:30 o'clock Louis Carroll went out, and left a man there in charge, and locked the door; left a Mr. Tyler there to see that plaintiff did not run away; that plaintiff knew that Mr. Tyler was there to watch him to see that he did not run away, because Tyler said nothing, but walked up and down the floor all time he was there, until Louis Carroll came back with a bicycle policeman, and locked the door behind him, and said to plaintiff, "I want you," and plaintiff said, "What do you want me for?" and Louis Carroll said, "They say you are in it, all of them say you are in it," and plaintiff said, "I don't know anything about it. I will go down and tell you or anybody else you want to have investigate this thing," and plaintiff said, "You ought to know me, I have worked for you people too long and handled too much of your stuff to be accused of anything of this kind." That he was taken away from the place of business of the defendants by a bicycle policeman named Connors, and to Number One Precinct, where he was searched and everything taken from him; he was put behind the bars, and about 9 o'clock at night he was taken out of his cell into a room, and questioned by Detectives Springman and O'Brien in the presence of the Carroll Brothers and Arthur Tyler, and the colored man said to plaintiff, "You know something about it," and the detectives began questioning Arthur Tyler about his movements the morning the cable was stolen, and then Arthur Tyler was taken away, and Detective O'Brien said to plaintiff, "Jackson, do you deny all these allegations?" to which plaintiff said, "Yes, sir," and he said, "You know absolutely nothing about this thing?" and plaintiff replied "No, sir," and asked Harry Carroll if he was going to hold him for this thing, and Carroll replied "Sure, I am going to hold you." He pulled plaintiff in the toilet room, and said, "Now, Jack, if you 'fess up we will turn you loose," and plaintiff said "No, I will not 'fess up to a lie, and I will not own

up to a crooked lie," and thereupon plaintiff was put back in the cell and remained there from Saturday night until Monday morning; that plaintiff suffered in the cell from cold, and plaintiff asked for bedclothes to keep him warm, but suffered from cold for want of adequate bedclothes; that at about 12 o'clock at night a prisoner was brought in and put in the cell with plaintiff, making the situation more disagreeable; that he asked Detectives Springman and O'Brien to notify his people, but no one notified his father or mother, who found him in a cell on Monday morning and tried to get him out. That he was taken to the police court between Detectives Springman and O'Brien, and marched up the street from the First Police Precinct on Twelfth street to the police court on D; that when first arrested by Policeman Connors he was marched down Twelfth street, with Connors on one side and one of the Carrolls on the other, and put in a cell at the First Precinct; that he was in charge of Detective Springman at the police court, and was released without being tried; that plaintiff never went back into the employ of the defendants; that after his arrest he was out of employment for four months.

Cross-examination: He testified that prior to his arrest his relations with the Carrolls seemed to be friendly, and that he had no trouble with them, and they were satisfied with his work; that he had carried the keys to the store and warehouse until they had moved to the new store, and that he did not have the keys to the warehouse after that; they were hung on a nail beside him by Louis Carroll, who put the nail up and hung the key there, and that after the Carroll Brothers moved into the Twelfth street store the key to the warehouse was in the custody of whoever was in the store at the time, and Louis Carroll and his brother both had duplicate keys to the warehouse and every place in the building. He further testified that the keys were under his charge. They were put on a nail beside him.

Patrick O'Brien for plaintiff testified that he was a detective sergeant on the Metropolitan Police Force; that Louis Carroll called at detective headquarters, and reported that his goods were being stolen, and that witness and Springman were assigned to the case; that they followed Tyler, the driver, and

found where he had sold goods stolen by him from the defendants; that they arrested him and brought him to the defendants' store, where he admitted that he had been stealing and selling the goods; that he and Springman in the presence of the defendants asked Tyler if the plaintiff was connected with the stealing, and Tyler replied in the negative. Then witness told Mr. Carroll he would not arrest the boy. Had nothing against him. Insisted that his attorney told him that he would have to to refuse to arrest anybody, he said on suspicion. He had nothing to do with the arrest of the plaintiff.

Springman testified that he and O'Brien were detailed to watch Tyler, who was under suspicion of stealing lead cable and electrical fixtures from the defendants' store; that they arrested Tyler on January 6, 1912, took him to defendant's store, where he confessed to stealing their goods from the warehouse. O'Brien brought the plaintiff up, and Tyler positively stated that defendant had nothing to do with the stealing.

Joseph Carter, a police sergeant, said he was acting as chief inspector, on January 6, 1912, and received a telephone message purporting to come from the defendants' store to the effect that Tyler had made a confession, implicating the plaintiff in the stealing, and requesting that the plaintiff be arrested; that he informed the person calling that it was Springman and O'Brien's case, and that he would get into communication with them. He did not authorize anyone to make the arrest.

Joseph A. Connors testified that he was a bicycle police officer at Number One Station. That Officer Edwards, acting on orders from police headquarters given him by Sergeant Carter, had instructed him to go with Louis Carroll to his store, and arrest plaintiff. Carroll and he went to the defendants' store, and Carroll pointed out plaintiff, stating that he was the man he wanted arrested. That plaintiff denied having anything to do with the stealing, and voluntarily went with him and Louis Carroll to Number One Police Station, where Carroll put a charge of larceny against the plaintiff on the blotter; that the arrest was made without a warrant.

Richard LeRoy Parry, plaintiff's father, was introduced as a withness. He was asked by his counsel.

Q. Did you get a telephone message upon the evening of January 6th, 1912, relative to your son?

A. Yes, sir, between 7 and 8 o'clock.

Q. From whom was this message?

A. From Mr. Carroll's office, but who directly sent the message, I don't know.

Q. Was it a man talking over the phone?

A. Yes, sir, it was a man's voice.

Q. Who did this party represent himself to be?

Counsel for the defendants objected to the witness stating this telephone communication unless he could identify the defendant, or one of the defendants, as the party talking over the phone. The court overruled the objection, and exception was noted.

Counsel proceeded with the interrogation.

Q. Who did the party at the telephone represent himself to be?

A. From Mr. Carroll's office.

Q. Who did the party talking to you over the telephone say he was?

.A. He did not say.

The court asked:

Q. What was the call, what did he say to you over the telephone?

A. He called up and said Jackson would be working late that evening.

Counsel said, that is his son, the plaintiff.

Q. Tell what this voice said over the telephone?

A. He said that Jackson would be working late, and would be late getting in. Of course, we had had him late home to supper before. He was late getting home before, and we thought nothing of it.

Q. Did you know the voice, or do you know the voice of either of the Carrolls?

A. I do not know one of them when I see them. I do not know a thing about their voices.

That on the day following, which was Sunday morning, witness called up the office of Carroll Brothers, and asked for Mr. Carroll, and someone talked with him on the phone in a man's voice; did not know who was talking, but it was the voice of the person who answered the phone; that witness inquired about his son, saying, "Have you seen Jackson this morning? Is he still at work?" and the man's voice said he supposed so. Witness did not know whether the voice said he was working or not, but took it for granted he was, and thereupon remarked that "it is rather hard to work all day Saturday and Saturday night and then work Sunday, and if it is his own choice, I have no word to say about it;" and it was between 8 and 9 Sunday night before witness knew that his son, the plaintiff, was under arrest, and he received the notice of his son's arrest at that time from the office of Carroll Brothers.

Plaintiff closed, and one of the defendants, Harry R. Carroll, testified that Tyler was arrested by Springman and O'Brien, and brought to his store, and asked if any other employee was implicated with him in the stealing; that neither he nor Louis Carroll asked him anything about plaintiff's connection with the stealing; that he did not request O'Brien or any other person to arrest plaintiff; that he did not state that Mr. Diggs had told him that the officer would be compelled to arrest any person he desired arrested; that he never at any time ordered or authorized the plaintiff's arrest; that Tyler stole cable from his store to the value of $85, for which offense he was arrested. That plaintiff had the custody of the key to the warehouse from which the goods were stolen.

On cross-examination he said that on the statement of Tyler he believed plaintiff to be guilty of participating in the crime with Tyler; that he did not prosecute plaintiff in the police court, because Officer O'Brien told him Tyler had denied what he had previously said respecting plaintiff's guilt; that he did not telephone plaintiff's father on January 6th, 1912; that he

and his brother, Louis Carroll, were under the impression all the time that the police department was conducting the case, as they had applied to it for assistance in detecting the person guilty of stealing their goods; that neither O'Brien nor Springman ever told him there was no evidence against the plaintiff upon which to base his arrest. That plaintiff had been working for the firm for eight or nine months; that he was an absolutely satisfactory clerk, and that the witness had always found him honest; that he knew that the plaintiff had a father who would be interested in the arrest of the plaintiff, but that he did not telephone him on Saturday, but did telephone him on Sunday of his son's arrest; telephoned plaintiff's father between 10 and 12 o'clock Sunday morning, and told him that his boy was in trouble, but did not mention the kind of trouble; that plaintiff had told the witness that he did not have anything to do with the stealing, but that after that witness made no effort to have the plaintiff released. After the plaintiff was released the witness told the plaintiff that he might have his position if he wished it.

Defendant Louis D. Carroll testified that Springman and O'Brien were endeavoring to ascertain the persons who were stealing their goods; that on the morning of January 6th, 1912, he, in order to assist them, followed Tyler, saw him approach their warehouse, take out a key, unlock the door of the warehouse and enter, and shortly afterwards reappear with cable belonging to the defendants of the value of $80; that plaintiff was the sole custodian of the key to the warehouse; that Tyler was arrested and brought into their store; nothing was said at the store concerning plaintiff's connection with the crime; during the afternoon of January 6th, 1912, a Mr. Schlegel came into the defendants' store and stated he had been to Number One Police Station to see Tyler, who was being held there for stealing defendants' cable, and that Tyler had stated that the plaintiff was implicated in the crime, and that, acting on this information, he went to see Tyler, and was told by him that plaintiff and he had divided the proceeds of the crime; and that

after the confession of Tyler, Officer Edwards directed Officer Connors to arrest plaintiff; that he accompanied Connors to the store and pointed out the plaintiff. That he did not order his arrest. Did not call plaintiff's father over the telephone on January 6, 1912.

Cross-examined, he said that when the colored boy Tyler was sent to the warehouse by the plaintiff, there was no objection to Tyler having the keys of the warehouse, and that for any proper purpose the plaintiff had a right to give Tyler the keys to the warehouse. When asked if he did not place on the blotter at Number One Precinct a charge of larceny against the plaintiff, witness answered, "I cannot recall that I did. Does the record show it?" That he saw plaintiff on Saturday at the police precinct; that he did not at any time after the arrest of plaintiff notify plaintiff's father or call up the house where plaintiff and his father lived. Plaintiff had worked for him about eleven months. Did not know that a charge of larceny had been made against the plaintiff on the blotter at Number One Precinct.

Harry F. Schlegel testified that he had some business with Tyler, and learned he was locked up at Number One Police Precinct; that he called there, saw Tyler, and was told by him that a young white man was implicated with him in the stealing of defendants' goods, and that this young white man had fixed the stuff so he could get it; that he communicated this fact to Louis D. Carroll.

Arthur Tyler testified that he was formerly employed by defendants; that after he was arrested for stealing their goods, he was locked up in Number One Police Station, and Mr. Schlegel called to see him; that afterwards Louis D. Carroll called, and witness told him that witness and the plaintiff were acting together in stealing the cable; that he stole the cable from the warehouse, and got the key from the plaintiff; and that plaintiff was the only one who had the custody of the key.

Cross-examined, he said that Parry was in with him.

Q. How was he in with you?

A. We were both working together on this stuff.

.William J. Kerns testified that he was a police officer sta-tioned at Number One Police Station; that Louis Carroll called at the station between 3 and 4 o'clock January 6th, 1912, that he and Carroll went to Tyler's cell, and that Tyler then and there confessed that he had been stealing defendants' goods, and that he and the plaintiff were acting together in dividing the spoils.

Louis H. Edwards, police officer, stated that Louis D. Car-roll called at the station, and asked for the arrest of the plaintiff; that he called up Sergeant Carter, who asked if he had heard the confession of Tyler; upon his answering no, he left the phone and talked with Tyler, and then went back to the phone, and told Carter that he had talked with Tyler, who had stated that plaintiff was his confederate in the crime. Carter ordered plaintiff's arrest, and that, acting on the authority of Carter, he directed plaintiff's arrest.

On cross-examination witness said he had never seen Louis Carroll before January 6, 1912, and that Carroll came to the station that day for an officer to go to his place of business and arrest the plaintiff. That was the first he knew about the case.

In rebuttal, plaintiff offered Edwin B. Hess, who testified that he was chief clerk of the Police Department. He was shown a book, and stated it was a record of the arrests kept in the detective bureau at police headquarters. That he had a record there of the arrest of Arthur Tyler. This is a book of original entry. Witness is in charge of the records. Did not make the entry. His attention was called to an entry dated January 6th, 2.20 P. M., "Arthur Tyler, 1912 Tenth street, was arrested on charge of petit larceny, 24, black, U. S., married, can read and write, complainant Louis Carroll, 514 Twelfth street, N. W. Officers Springman and O'Brien."

Shown another record that Arthur Tyler was convicted of larceny in eight other cases arising out of the same offense. He was then asked to look for the name of Parry. He said, "I

find on January 6th, at 6 o'clock P. M. Jackson G. Parry."
Memorandum is "Jackson G. Parry, 712 F street N. W., ar-
rested on charge of grand larceny, 20 years old, white, U. S.
clerk, single, can read and write, complainant Louis D. Carroll,
514 Twelfth street N. W. Officers Springman and O'Brien, dis-
position dismissed."

Asked who was the prosecutor or complainant in each case,
he said Louis D. Carroll.

Defendants objected to the introduction of this record, be-
cause it was not shown to be made by them or either of them.

Jackson G. Parry, being recalled, testified that the colored
boy Tyler had stated to him that he got in the warehouse to
steal the cable by pulling the staple, and that Tyler had made
this statement in the presence of both of the defendants, Harry
and Louis Carroll.

The jury returned a verdict for $5,000. On motion for new
trial, the plaintiff consented to a remittitur of $2,500. The
motion was overruled, and judgment entered for that amount.
Defendants have appealed.

*Mr. J. J. Darlington* and *Mr. Charles F. Diggs,* for the ap-
pellants, in their brief cited: *Crescent City Live Stock Co.* v.
*Butcher Union,* 122 U. S. 141; *Edgar* v. *Burke,* 96 Md. 715;
*Johns* v. *Marsh,* 52 Md. 323; *Knickerbocker Ice Co.* v. *Gardi-
ner,* 107 Md. 556; *Meguire* v. *Corwine,* 101 U. S. 108, 111;
*Merchants' Bank* v. *State Bank,* 10 Wall. 604; *Michigan Bank*
v. *Eldred,* 9 Wall. 544; *National Union* v. *Thomas,* 10 App.
D. C. 277; *Oberman Brewing Co.* v. *Adams,* 35 Ill. App. 540;
*Pickford* v. *Hudson,* 32 App. D. C. 480; *Prigg* v. *Lansburgh,*
5 App. D. C. 30; *Snell* v. *United States,* 16 App. D. C. 501,
516, 517; *Spitzer* v. *Friedlander,* 14 App. D. C. 556; *Stewart*
v. *Sonnebourne,* 98 U. S. 187; *Swing* v. *Walker,* 28 Pa. Super.
Ct. 366; *Young* v. *Seattle Transfer Co.* 33 Wash. 225; *Wig-
more, Ev.* § 2155.

*Mr. Thomas M. Baker, Mr. Robert I. Miller,* and *Mr. Cran-
dal Mackey,* for the appellee, in their brief, cited: *Bashor* v.

*Forbes,* 36 Md. 164; *Brown* v. *Rice,* 76 Va. 629; *Evanston* v. *Gunn,* 99 U. S. 660, 666; *Flach* v. *Gottschalk,* 88 Md. 369; *Gen. Hosp. Soc.* v. *New H. Rend Co.* 79 Conn. 581; *Globe Print Co.* v. *Stahl,* 23 Mo. App. 451; *Godair* v. *Ham. Nat. Bank,* 225 Ill. 572; 1 Greenl. Ev. 483, 484; *Kansas City Star Co.* v. *Standard W. Co.* 99 S. W. 765; *Knickerbocker Ice Co.* v. *Gardiner,* 107 Md. 556; *Missouri P. R. Co.* v. *Heidenheimer,* 82 Tex. 201; *Norfolk & W. R. Co.* v. *Cheatwood,* 103 Va. 369; *Oberman Brewing Co.* v. *Adams,* 35 Ill. App. 540; *Potter* v. *Rock Island & P. R. Co.* 36 Ill. App. 592; *Prigg* v. *Lansburgh,* 5 App. D. C. 46; *Rogers G. Co.* v. *Tanton,* 136 Ill. App. 533; R. S. D. C., § 386; *Shawyer* v. *Chamberlain,* 113 Iowa, 742; *Slater* v. *Taylor,* 31 App. D. C. 104; *Spitzer* v. *Friedlander,* 14 App. D. C. 562; *Staples* v. *Johnson,* 25 App. D. C. 155; *Swing* v. *Walker,* 27 Pa. Super. Ct. 366; *United Cigar Stores* v. *Young,* 36 App. D. C. 409; Wigmore, Ev. § 2155; *Wolfe* v. *Missouri P. R. Co.* 97 Mo. 473; *Young* v. *Seattle Transfer Co.* 33 Wash. 225.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The first assignment of error is on the exception taken to the admission of the testimony concerning the alleged telephone conversation between plaintiff's father and the office of the defendants.

The materiality of this testimony is shown by the following recital in the bill of exceptions: "In the presentation of the case to the jury, counsel for the plaintiff argued that the telephone message of Saturday, January 6th, 1912, testified to by the witness Richard Le Roy Parry, had been sent by the defendants for the purpose of keeping the plaintiff's relatives in ignorance of his arrest and imprisonment, and to prevent steps to procure his release, by giving bail or otherwise, and in order that the police officials might have an opportunity to obtain a confession from him that he was guilty of the offense charged." This argument was evidently taken by the jury as showing ex-

press malice in making the arrest, and was reflected in the verdict, one half of which was remitted.

We think the exception well taken. *Young* v. *Seattle Transfer Co.* 33 Wash. 225, 63 L.R.A. 988, 99 Am. St. Rep. 942, 74 Pac. 375; *Knickerbocker Ice Co.* v. *Gardiner Dairy Co.* 107 Md. 556, 571, 16 L.R.A.(N.S.) 746, 69 Atl. 405; *J. Oberman Brewing Co.* v. *Adams,* 35 Ill. App. 540.

The bill of exceptions shows that a call purporting to come from the office of the defendants was answered by plaintiff's father. The conversation is set out in the foregoing statement. There was no identification of the person talking to the witness, and nothing to indicate that it was one of the defendants who called him up. As said in *Young* v. *Seattle Transfer Co.* supra: "When material to the issues, communications through the medium of the telephone may be shown in the same manner and with like effect as conversations had between individuals face to face, but the identity of the party sought to be charged with a liability must be established by some testimony, either direct or circumstantial. It is not always necessary that the voice of the party answering, or of either party, for that matter, be recognized by the other in such conversations, but the identity of the person or persons holding the conversation, in order to fix a liability upon them or their principals, must in some manner be shown. To hold parties responsible for answers made by unidentified persons, in response to calls at the telephone from their offices or places of business concerning their affairs, opens the door for fraud and imposition, and establishes a dangerous precedent, which is not sanctioned by any rule of law or principle of ethics of which we are aware. A party relying or acting upon a communication of that character takes the risk of establishing the identity of the person conversing with him at the other end of the line."

Cases cited on behalf of the appellee are not in point. *Wolfe* v. *Missouri P. R. Co.* 97 Mo. 473, 481, 3 L.R.A. 539, 10 Am. St. Rep. 331, 11 S. W. 49. The question arose incidentally, and it does not appear how the party was called or the circumstances attending the identification.

*Missouri P. R. Co.* v. *Heidenheimer,* 82 Tex. 201, 27 Am. St. Rep. 861, 17 S. W. 608. In that case a demand was made upon a railroad office for goods. Party could not tell who it was that answered him. He recognized the voice as one of the employees of the office with whom he had done business before. The question was one simply of demand of goods that had been shipped.

*General Hospital Soc.* v. *New Haven Rendering Co.* 79 Conn. 581, 583, 118 Am. St. Rep. 173, 9 Ann. Cas. 168. The action in that case was by a hospital society to recover of the rendering company for the treatment of two of its injured employees in the hospital. Manuel, who was in the plaintiff's employ and in charge of telephone calls at the hospital, and as agent of the hospital, received a telephone call purporting to be from the defendant company, asking for the despatch of an ambulance for two men who had been severely burned. The court found that the message had in fact been sent from the office of the defendant. The court said: "The fact that a person in the defendant's office, apparently in charge as its representative, told the plaintiff to send an ambulance as testified, is a fact relevant to the issues raised by the pleadings. The defendant, however, did not object to this testimony, and it was received by the court without objection. The witness further testified that he asked who would pay for the treatment of these men, and was informed that the defendant would take care of the expense. The defendant objected to so much of the witness's testimony as stated the answer to the witness's question as to who would pay for the care of the injured men. The court overruled this objection, and the defendant excepted." The men were delivered to the hospital society, who sent their ambulance as requested, for the purpose of receiving and treating them.

2. The second assignment relates to the memorandum entered on the blotter of the police department. It does not appear that this was written by either one of the defendants, and it is a memorandum made in accordance with the duties of the office, showing the names and charges, etc., when parties are arrested.

The record is inadmissible. *Prigg* v. *Lansburgh,* 5 App. D. C. 30, 36; *National Union* v. *Thomas,* 10 App. D. C. 277, 292; *Snell* v. *United States,* 16 App. D. C. 501, 517.

3. The last assignment of error is on the refusal of the court to give an instruction asked by defendants, stating the facts relied on to show probable cause. It is unnecessary to set out this instruction, for the court did not give the jury a charge telling them what facts, if found to be true, would constitute probable cause, but left the question entirely to the jury. When the facts relied on to constitute probable cause are in dispute, as they were in this case, their existence is for the determination of the jury, but their legal effect, if found to be true, is for the court. As the case is to be reversed it is unnecessary to elaborate the point. *Spitzer* v. *Friedlander,* 14 App. D. C. 556, 562; *Slater* v. *Taylor,* 31 App. D. C. 104, 18 L.R.A. (N.S.) 77; *United Cigar Stores* v. *Young,* 36 App. D. C. 409; *Staples* v. *Johnson,* 25 App. D. C. 155, 160; *Mark* v. *Rich, ante,* 182, present term.

For the errors pointed out, the judgment will be reversed, with costs, and the cause remanded for a new trial. *Reversed.*