## MARY E. MORSE, Administratrix, *v.* NATIONAL CENTRAL BANK.

*Presumption of Payment—Lapse Of Time—Bank Deposit.*

In order that the lapse of time may raise a presumption of payment, it must be for at least twenty years, in the absence of statute naming a shorter period.                    p. 147

The presumption of payment from lapse of time may be excluded by affirmative evidence, other than the instrument itself, that the debt has not been paid, or by circumstances explaining the creditor's delay in asserting the claim.        p. 147

In applying the presumption of payment from lapse of time, the question whether the time shall be computed from when the cause of action accrued is largely dependent upon the facts and circumstances of the particular case.        pp. 154, 155

In an action against a bank to recover deposits appearing on bank books found among decedent's effects, *held* that, it appearing that for fifty years after the date of such deposits decedent made no demand therefor, nor had interest computed thereon, or the books balanced, the period from the lapse of which a presumption of payment arises commenced at a date much earlier than the date at which the demand for a return of the deposits with interest was made by the administrator, and that payment of the deposits was to be presumed.        p. 155

In such action there was at least no reversible error in the admission in evidence of entries and regulations in the deposit books indicating payment of the deposits, of evidence that decedent had an active account in another bank, on which interest was entered, or of evidence of the bank's policy of discontinuing accounts such as decedent's.        pp. 155, 156

Where the lapse of time is relied on to raise a presumption of payment, evidence fairly tending to support or rebut the presumption is admissible, as is testimony explaining and contradicting evidence tending to rebut such presumption.    p. 156

*Decided March 9th, 1926.*

Appeal from the Superior Court of Baltimore City (FRANK, J.).

Action by Mary E. Morse, administratrix of Maria Dittmar, deceased, against the National Central Bank of Baltimore. From a judgment for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, and WALSH, JJ.

*Gerge Ross Veazey,* with whom was *Lloyd L. Jackson, Jr.,* on the brief, for the appellant.

*Harry N. Baetjer* and *Joseph France,* with 'whom were *Venable, Baetjer & Howard* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

Maria Dittmar, on the 24th day of January, 1873, deposited with the German Savings Bank of Baltimore City the sum of two thousand eight hundred and twenty-five dollars and fifty cents, and received from the bank a deposit book therefor No. 5755. On the 5th day of May of the same year she made a further deposit of one hundred dollars, and on July 30th she withdrew from the bank the sum of twenty-seven dollars and seventy-five cents. The two deposits, as well as the withdrawal, were entered on the book given to her.

On May 5th, 1873, the same day upon which she made the deposit of the one hundred dollars above mentioned, Mrs. Dittmar deposited with said bank four hundred dollars, and received from it a deposit book No. 6117, in which the deposit of four hundred dollars was entered.

About a week prior to the death of Mrs. Dittmar, which occurred on November 26, 1922, at the age of ninety years, while she was ill and at the time unconscious, her grandson, Wm. A. Codd, went to her home and took from her locked bureau drawer, without her knowledge and direction, cer-

tain articles belonging to her, consisting of jewelry, fire insurance papers, deed for cemetery lot, savings account books and check book on the Drovers and Mechanics Bank, the two deposit books of the German Savings Bank above mentioned, and a savings account book of Herman Dittmar, the husband of Maria Dittmar, in the German Savings Bank, though Herman Dittmar had died forty-eight years prior to such time.

Codd, it seems, had to some extent looked after the business affairs of Mrs. Dittmar after she became unable to do so, and upon her direction had drawn money both from the Savings Bank of Baltimore and the Eutaw Savings Bank for her support and maintenance, as well as to pay taxes and expenses upon her property. He knew that she kept her valuables in the drawer mentioned, but he did not know of the existence of the deposit books of the German Savings Bank, as he had never seen them nor had he ever heard his grandmother mention them. These things were all removed from the drawer, as he says, to keep them from being scattered, and were, after the death of his grandmother, given to his aunt, Mrs. Mary E. Morse, the appellant, who lived with her mother, Mrs. Dittmar, and who became administratrix of her mother.

The record discloses that these deposit books of the German Savings Bank were first given to one George Loden, the son-in-law of Mrs. Morse, and her first legal advisor in the settlement of her mother's estate. The books were in his possession at the time of his death, which occurred in September, 1923, when they were returned to Mrs. Morse and she, in the same month, presented them to the National Central Bank, the successor of the German Savings Bank, and demanded payment of the amount claimed by her upon them. Payment was refused upon the ground that there was nothing owing thereon, and suit was thereafter instituted to recover the amount so claimed by the appellant. The case was heard by Judge Frank, sitting without a jury, in the Superior Court of Baltimore City,

and a verdict was rendered by him in favor of the defendant, and upon such verdict a judgment was entered for defendant's costs. It is from that judgment the appeal in this case was taken.

In the trial of the case eight exceptions were taken to the rulings of the court; one upon the prayers and seven to the admission of evidence.

The plaintiff offered one prayer, which was rejected, while the defendant asked for six instructions. Of these, the fourth was granted and the others refused. The court was asked by the plaintiff's prayer to rule as a matter of law that should it "find that the deposits entered in the two pass books offered in evidence were credited to the account of Maria Dittmar, then the burden of proof is upon the defendant to establish by the preponderance of the evidence that the said funds have been paid out by the defendant upon the authority of the deceased Maria Dittmar, and if the court sitting as a jury shall find that the defendant has not met this burden of proof, either as to all or to part of the said deposits, then, if the court sitting as a jury further finds that the accounts in question were savings accounts, the verdict of the court sitting as a jury shall be for the plaintiff for the amount of said deposits (less sums which have been shown to have been paid out as aforesaid) plus interest on the deposits at the rate of five per cent. per annum, compounded on the first day of January and the first day of July in each year, to the date of trial."

By the defendant's fourth prayer, which, as we have said, was granted, the court instructed itself, sitting as a jury, that should it find "that for a period of more than forty-five years prior to the date on which demand was made by the plaintiff's intestate for the payment to her of the amounts shown by the two savings bank books offered in evidence, no demand or claim of any kind had been made on the defendant or its predecessors by the plaintiff's intestate or on her behalf, for said sums or any part thereof or any interest thereon, that then it is incumbent on the plaintiff to prove by a

preponderance of evidence, and not only by the production of
the books themselves, that the amounts shown on said books
had not been paid by the defendant."

In passing upon these prayers the court was called on to
decide upon the facts of this case, whether there existed a
presumption arising from lapse of time, that the amount
once owing to appellant's intestate, by reason of said deposits,
had been paid.

It is said in 21 *R. C. L.* 128:

"In all civilized countries where the. law is administered
as a science, having a reference to the peace, quiet and
progress of society, as well as to the protection of individual
rights, it has been thought wise that there should be some
limit to litigation, some boundary beyond which contests
or matters open to contest should be regarded as settled.
Early in the judicial history of England the presumption
of payment was raised after a great lapse of time between
the creation of an obligation and an attempt to enforce it
in the courts. This presumption became a part of the law
of the United States and is applied in all jurisdictions.
* * *

"The presumption rests, not only on want of diligence in
asserting rights, but on the higher ground that it is neces-
sary to suppress frauds, to avoid long dormant claims, which,
it has been said, have often more cruelty than justice in
them; that it relieves courts from the necessity of adjudi-
cating rights so obscured by the lapse of time and the acci-
dents of life that the attainment of truth and justice is
next to impossible. In a word, * * * the most solemn of
human obligations lose their binding efficacy and are pre-
sumed to be discharged after many years. Forbearance to
enforce a pecuniary claim is not direct evidence that the
money has been paid, but on the fact of forbearance the law
builds a presumption that a demand has been satisfied, rest-
ing it on the rational ground that a person naturally desires
to possess and enjoy his own, and that an unexplained neglect
to enforce an alleged right for a long period casts suspicion

on the existence of the right itself, because in the ordinary
course of human affairs it is not usual for men to allow real
and well founded claims to lie dormant a great length of
time. * * *

"The presumption of payment is conclusive in the sense
that where it appears that the requisite time has elapsed
and no countervailing evidence is given, neither the court
nor the jury is at liberty to find that the debt was not paid;
but it is not conclusive in the sense that the plaintiff may
not introduce evidence to disprove the fact which by force
of law the lapse of time establishes."

Unless made shorter by statute, the lapse of time required
to raise the presumption is twenty years, and no such pre-
sumption arises merely from a lapse of less time.    30 *Cyc.*
1274.

The distinction between such a presumption and the statute
of limitations is well stated in *Reed v. Reed,* 46 Pa. 239,
where it is said "the latter is a prohibition of the action; the
former, *prima facie,* obliterates the debt.    The bar is re-
moved by nothing less than a new promise to pay or an
acknowledgment consistent with such a promise.    The pre-
sumption is rebutted, or, to speak more accurately, does not
arise where there is affirmative proof beyond that furnished
by the specialty (or the instrument upon which suit is
brought) itself, that the debt has not been paid, or where
there are circumstances that sufficiently account for the delay
of the creditor."    See copious note to *Sheafer v. Woodside,*
1 A. L. R. 775, upon presumption of payment from lapse
of time.

This presumption of payment arising from lapse of time
is universally recognized and its existence is not denied by
the appellant, although, upon the facts disclosed by the rec-
ord, its applicability to this case is disputed by her.

The German Savings Bank was incorporated in 1868, and
at that time it entered into and continued business until the
incorporation of the German Bank of Baltimore, in 1874,
when it was succeeded by the last named bank, which in

1918 was succeeded by the National ·Central Bank of Baltimore.

The rules and regulations of the German Savings Bank applicable to the deposits made by Mrs. Dittmar and entered in deposit books No. 5755 and No. 6117, written both in English and in German, are found to be the same. Among them are found the following rules and regulations:

"No. 5. Accumulated interest will be added to depositors' accounts on or after the first day of January and July of each year and will then bear interest in like manner as regular deposits.

"No. 6. Every three years an extra dividend will be declared for deposits of 3, 2 and 1 years uninterrupted standing, if the condition of the bank justify such declaration.

"No. 7. Depositors are requested to hand in their deposit-books every six months for entering interest and balancing accounts.

"No. 9. Business accounts, viz. deposits subject to being checked out will not draw interest. Deposits of that kind must be accompanied by deposit checks and will be paid out upon the depositor's check without the presentation of the bank book being required, the books however must be presented at the bank at least once every three months for settlement."

It will be observed by rule or regulation (7) that depositors were requested to hand in their deposit books every six months that the interest mentioned in rule (5) might be entered; and by rule (9) business or checking accounts drew no interest and deposits therein would be paid out upon the depositor's check without the presentation of the bank book, though the rule provided that the books should be presented at the bank at least once every three months for settlement.

Mrs. Dittmar, on May 5th, 1873, the day she opened the second account, known as No. 6117, deposited five hundred dollars in the German Savings Bank. Of this amount she deposited four hundred dollars in the new account and one hundred dollars in the first account or account No. 5755.

Why she did this is not disclosed by the record, unless one was to be a checking account and the other a savings account. The second account, or account No. 6117, shows upon its face the following entry: "July 30th, by check 27.72." Through this entry a line is drawn, indicating that such entry was made in error; and on the face of the first account, or account No. 5755, is shown the same entry, which was allowed to remain as entered. The erasure of this entry in the second account, and its insertion in the first, might indicate that the first was a checking account while the second account was not so intended, and if this be so, then it explains why the amount deposited on May 5th was divided and a part of it deposited in the new account then opened.

In the second account, or deposit book No. 6117, there appears the notation "Int. 8.35." This sum is the amount of interest on the deposit of four hundred dollars from June 1st, 1873, the first month after the deposit of the four hundred dollars, to the first of November, 1873; and upon the other side of the account are found the figures "408.35," that amount being at that time, November 1st, 1873, with the interest added, the sum owing on the account. But on the first account or deposit book, No. 5755, we find only the entries of the two deposits on one side and the entry "July 30, by check, 27.75" on the other. The fact that the interest is computed to a given date in book No. 6117 and not in book No. 5755, further indicates that the account in book No. 6117 was a savings account upon which interest was payable, and that the account in book No. 5755 was a checking account, upon which no interest was to be paid under rule or regulation (9), which, as we have seen, provides that no interest was to be paid on checking accounts.

Treating account No. 6117 as a savings account, there is nothing upon it, after the notation of the interest mentioned, showing that the depositor ever, at any time thereafter, presented her book to the bank that the semi-annual interest accruing from time to time might be entered thereon in compliance with the request made of her by rule (7) of the rules

and regulations of the bank; nor is there any entry in book No. 5755, if treated as a savings account, showing any compliance with rule (7); and if treated as a checking account, there are no entries therein showing a compliance with rule (9) of the regulations, in which it is said, the books "must be presented at the bank at least once every three months for settlement." It would seem that these books remained in the possession of Mrs. Dittmar from July, 1873, to the time of her death in November, 1922, a period of more than forty-nine years, during all of which time they were never presented to the bank that the entries, required under the rules and regulations of the bank, printed upon the books themselves, might be made thereon, although these entries were to be made at intervals of not more than six months through all of said period.

In the drawer with these books was found by Codd, grandson of Mrs. Dittmar, a deposit book of her husband, Herman Dittmar, showing that he in 1871 opened an account with the German Savings Bank in which he first deposited therein, on January 9th of that year, one thousand and sixty-nine dollars, and thereafter five other sums, the last on July 1st, 1873, amounting in all, with the first deposit, to one thousand one hundred twenty-four dollars and ninety-two cents, and between the date of the first and the date of the last deposit he had withdrawn therefrom in cash, not by check, the sum of five hundred and ninety-eight dollars. It is shown upon the face of this account that four months' interest, from July 1st to November 1st, on the balance owing, five hundred twenty-six dollars and ninety-two cents, was added to the deposits and the account then balanced, showing that at that time five hundred thirty-five dollars and seventy cents was owing thereon. The date to which interest was calculated on Herman Dittmar's account, November 1st, 1873, the same day to which interest was computed on account No. 6117, was not one of the dates named to which interest was to be computed under rule (5) of the regulations. Why the interest was computed on both of these accounts to the date

named and not to the regular time, January 1st, 1874, in the rule mentioned, is not disclosed by the record.

Herman Dittmar died before November 6th, 1873, for on that day letters of administration upon his personal estate were granted to his widow, Maria Dittmar. It is a rational inference that the money owing on his account, if not collected by him before his death, was thereafter collected by his administratrix; and yet we find the deposit book therefor, which is in exactly the same condition as to entries as account No. 6117 of Mrs. Dittmar, with the interest paid up to the same time, in the possession of Mrs. Dittmar at the time of her death, more than forty-nine years thereafter, showing by the practice of the bank that such accounts were paid without the return of the books to the bank.

Mr. August Weber was clerk in the German Savings Bank of Baltimore City in 1873, when the deposits mentioned were made by Mrs. Dittmar, and he himself received the deposit of two thousand eight hundred and twenty-five dollars and fifty cents. He remained with the German Savings Bank so long as it was in business, and upon its retirement, continued in the service of its successor, the Baltimore German Bank, and then with the National Central Bank, of which he is now president. Mr. Weber, when on the stand, was asked what was the practice of the German Savings Bank of Baltimore City as to the withdrawal of moneys on deposit there between the years 1873 and 1875. His reply was, "We paid out on orders on us, and then we paid out on checks, and we had also a receipt book and when people would come and they wanted to draw checks, or otherwise, they would give us a receipt in the receipt books—orders, checks and receipts, three different methods were adopted." He was then asked, "During the period between 1873 and 1875, did or not the bank when checks were drawn on a depositor's account, honor it without the production of the book evidencing the account"? Ans. "Yes, sir, without the production of the book." Ques. "Was there or not any distinction made by the bank between 1873 and 1876 as to honoring checks

on accounts which it had"? Ans. "No distinction, no dis-
tinction whatever, * * * if they sent a check we would pay
without the book." Mr. Weber also testified that while the
German Savings Bank was still in existence they found that
the savings bank feature was not remunerative, and "notice
was given by letters sent out and also personal notice was
given; I was in the capacity of a clerk at that bank at that
time and I was instructed to assist in sending out notices,
and also if I could see any of the depositors to inform them
personally when they would come to present their bank books
for payment of interest, or to withdraw money, to notify them
that the German Savings Bank had ceased operations as a
savings bank and was going into the commercial business;
and we informed those people that we were very anxious
that they should close their accounts. Of course, the cashier,
Mr. Face, had so many personal friends, and so did I, that
we made it our duty not only to send the letters out, but also
to see as many of our customers as we could, and informed
them of the fact of the change from a savings bank to a
commercial bank." Before concluding his testimony, he was
asked by the court the following question: "After the German
Bank acquired the assets of the savings bank, did you or not
conduct a savings bank business thereafter"? His reply was
"No * * * we didn't take any money regularly on deposits,
but at times we made exceptions and took the money of a
business man, we took certain sums of money where he would
like to leave the money for a short period; we took that, but
very seldom; we did not want to take money on interest;
we abandoned that entirely in 1875."

Mr. Charles F. Lange, vice-president of the National Cen-
tral Bank, who had special charge and supervision over the
records of the bank, testified that the original books of entry
or the original ledgers of the German Savings Bank of
Baltimore City, so far as he knew, were destroyed or lost
during the Baltimore fire in 1904.

The personal estate of Maria Dittmar at the time of her
death, as shown by the inventory filed by her administratrix,

was as follows: home and furniture, $3,187.25; Eutaw Savings Bank (account), $1,017.18; cash, $360.37; total $4,-584.80. It was shown, however, that her home was, subject to a ground rent, appraised at $3,000.

It is the contention of the appellant that upon the facts stated there was no presumption of payment arising out of lapse of time, because, as claimed by her, it was not until demand for payment was made by Mrs. Morse, the appellant, in September, 1923, and the bank's refusal to pay, that any right of action against the bank accrued, and until such right accrued, the period of time out of which the presumption must be found to arise, did not begin, and this was less than one year before the institution of the suit.

In the note to *Sheafer v. Woodside, supra,* it is said, "The computation of the twenty-year period, from the lapse of which payment will be presumed, begins when the debt is due or demandable," *Diemer v. Sechrist* (1830), 1 Penr. & W. (Pa.), 419. In *Fagan v. Bach,* 253 Ill. 588, 26 A. & E. Ann. Cases, 505, it is said: "That the law presumes a debt which has been due and unclaimed and without recognition for twenty years, to have been paid, is unquestioned. In *McCoy v. Morrow,* 18 Ill. 519, it was said, on page 524, 'After the lapse of twenty years, debts, of whatever degree, are presumed to have been satisfied and this presumption will defeat the recovery on them unless rebutted by proof * * *. See also *Alston v. Hawkins,* 105 N. C. 3, 11 S. E. 164. In a note to this case, where it has been reported in 18 Am. St. Rep. 875, the editor states, 'Independently of the statute of limitations, the law raises a presumption, in the absence of explanatory evidence, that a debt which has been due and unclaimed and without recognition or payment of interest for twenty years, has been paid,' which statement, we believe, is a fair statement of law and one that is supported by the great weight of authority in England and in this country."

In *Sheldon v. Heaton,* 22 N. Y. App. Div. 308, a suit was brought by the husband, as administrator of his wife, upon

a certificate of deposit dated August 20th, 1864, At the time the deposit was made, both parties lived at Rouse Point. Mrs. Sheldon was then, and had been for several years, engaged in the millinery business, and the defendant had a store and was reputed to be wealthy. Mr. Sheldon was absent in California from 1859 to 1863. After his return, his wife continued in business for a short time until about the fall of 1864; after that the husband engaged in the butchering business, providing for the support of his wife and four children, until the death of the wife in August, 1872. On May 2nd, 1893, Mr. Sheldon took out letters of administration upon the estate of his wife, and soon after that presented to the defendant the certificate, or receipt, in question, demanding payment, and, upon its refusal, instituted suit upon the certificate of deposit. The certificate, it seems, was not seen by the husband until five years after the death of his wife, it being sent to him by his daughter, who was living in Toronto, Canada. The defendant made a general assignment in October, 1877, but he testified that he was insolvent at that time and that his debts were paid. There was no direct evidence of any demand until the plaintiff made the demand just before bringing the action. The defendant claimed that he had paid the money to the wife long before she died, but he was held incompetent to testify to transactions between him and the plaintiff's intestate, because of the latter's death. In that case, the lower court was asked to grant an instruction "that the interval of twenty years (sufficient to raise presumption of payment) must be computed from the time the cause of action accrued, not from the time the contract was executed." The court in that case sustained the ruling of the lower court in its refusal to grant such instruction, saying, "This request ignores the circumstance that the defendant had a right to pay without a demand, although the holder of the certificate would not have the right to sue until after demand was made * * *. Upon this subject, each case evidently must depend largely upon its own circumstance and it was not, I think, error to refuse the request." See also *Rosenstock v. Dessar,* 109 App. Div.

10, 95 N. Y. Supp. 1064; *Long, Excr., v. Straus,* 124 Ind. 84.

There are cases which hold that a presumption of payment from lapse of time arises only when sufficient time has elapsed when computing from the time the cause of action accrued. But as stated in *Sheldon v. Heaton, supra,* this question is largely dependent upon the facts and circumstances of each particular case. Upon the facts of this case, the period mentioned, in our opinion, commenced at a much earlier date than that upon which the demand was made by Mrs. Morse after the death of her mother, and that there was a presumption of payment as claimed by the appellees. The deposits were received in 1873, subject to the rules and regulations of the bank, clearly made known to and understood by the depositor, and for nearly fifty years, she not only made no demand for payment, but altogether ignored the requirements imposed upon her by such rules and regulations, by failing to present the books at the bank, at the times named, that the entries required might be placed therein. It is inconceivable that she, with her scanty means, remained silent and inactive while the interest on the deposits was constantly accumulating, if the debt remained alive, and not sufficiently interested in her own welfare to have the interest credited upon her books if she did not wish it paid to her. During all the time mentioned, she was in possession of the books and was living in Baltimore where the bank was located, and why she did not demand payment or comply with the aforesaid rules and regulations of the bank is not attempted to be explained. The learned judge below, in our opinion, committed no error in refusing the plaintiff's prayer and in granting the prayer of the defendant, predicated upon the theory that there was such a presumption of payment.

There are a number of exceptions involving the admission in evidence:

1st. Entries and regulations in the deposit books which indicated payment of debt claimed.

2nd.    Evidence that the decedent had a savings account in the Eutaw Savings Bank which was in active use.

3rd.    The entry of interest in this account.

4th.    Evidence that the German Savings Bank had in 1874-1875 notified its customers to close their accounts.

5th.    Evidence showing the relationship of Herman Dittmar to Maria Dittmar and her administration of his estate.

6th.    Evidence of the records of the orphans' court relating to this administration.

7th.    Evidence that no inventory was filed by the administratrix.

After carefully examining and considering these exceptions, we do not find any error in the court's rulings thereon, or at least no reversible error.    "Where the lapse of time is relied on to raise a presumption of payment, evidence fairly tending to support or rebut the presumption is admissible, as is testimony explaining and contradicting evidence tending to rebut such presumption."    30 *Cyc.* 1285; or "any circumstance which tends to make the presumption of payment either more or less probable is relevant and admissible in evidence on the issue of payment," 30 *Cyc.* 1281; or, as was said by the court in *Bean v. Tonnele,* 94 N. Y. 381, in discussing a case of this character, "The case is one in which the greatest liberality, consistent with the rules of evidence, should have been indulged in the proof of circumstances relevant to the question of payment."    The evidence admitted under these exceptions had sufficient bearing upon the issue presented to warrant its admission, but in no event was there any harmful or reversible error in the admission of any of it.

A motion to strike out the judgment was filed and overruled and from that ruling an appeal has been taken to this Court.    If this question is properly before us on the evidence taken upon the motion, the court committed no error in overruling it.    The judgment of the trial court will therefore be affirmed.

*Judgment affirmed, with costs.*