## STANNARD *v.* McCOOL

[No. 48, October Term, 1951.]

*Decided December 7, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Edward A. Smith,* with whom was *G. Elbert Marshall* on the brief, for appellant.

Submitted on brief by *James Weinroth* and *Edward T. Miller* for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from the granting of a demurrer prayer and a motion for a judgment N. O. V. in favor of the appellee, John W. McCool, after a verdict rendered by a jury for the appellant, James R. Stannard.

Of course, in deciding whether this demurrer prayer and motion should have been granted, we will resolve all conflicts in the evidence in favor of the appellant and assume the truth of all evidence and all inferences which may naturally and legitimately be deduced therefrom which tend to support appellant's claim. The evidence will therefore be recited in a light most favorable to the appellant. *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 532, 59 A. 2d 313.

In 1946, Mrs. Elizabeth A. Holmes, James A. Nowland, Jr., and Eva A. Nowland, residents of the state of Washington and heirs of the Nowland Estate, owned several properties located in Cecilton, Cecil County, Maryland, which were placed in the hands of a real estate firm, the Maryland-Virginia Farm Agency, for sale. On August 23, 1946, a Mr. Nicholson, the manager of the real estate agency, forwarded to Mr. Carroll C. Short

of Cecilton, the son-in-law and agent of the appellee, a contract of sale for the purchase by the appellee of certain lots belonging to the Nowland Estate, the purchase price to be the sum of nine thousand dollars. Mr. McCool signed this contract and it was returned to Mr. Nicholson, together with Mr. McCool's check, dated August 26, 1946, in the amount of $1,000.00, as the down payment. Mr. Nicholson deposited this check in the agency account and delivered the contract of sale to Mr. Hector J. Ciotti, who, with Mr. Robert Lee Slingluff, was attorney for the Nowland heirs. Messrs. Ciotti and Slingluff forwarded the contract of sale to their clients in the State of Washington on August 26, 1946. The contract was signed by the Nowland heirs and returned to Mr. Ciotti on October 10, 1946. Before this contract reached Baltimore, Mr. Stannard, the appellant, called Mr. Ciotti on the telephone from Cecilton and asked Mr. Ciotti whether he represented the Nowland Estate and when told he did, asked how much he wanted for the Cecilton properties. Mr. Ciotti told him: "They have been sold, the contract is on its way to the West Coast now." Stannard said: "How much have you been offered?" Ciotti replied: "I am sorry, I can't tell you. If you want to make an offer, make your offer in writing with a check. I cannot tell you about the offer that's been made. The contract is on its way out." On September 1, 1946, Mr. Stannard wired Mrs. Holmes. There was an exchange of telegrams, as a result of which Messrs. Ciotti and Slingluff received a wire from the counsel for the Nowland heirs in Seattle. An offer of $12,000.00 had been made by Mr. Stannard and the nine thousand dollar contract with Mr. McCool was cancelled. The signatures of the Nowland heirs were then perforated with holes by Mr. Slingluff and the nine thousand dollar contract was returned to the real estate agent, Mr. Nicholson, who kept it in his files. The one thousand dollars paid by Mr. McCool was later returned to him by Mr. Nicholson.

Messrs. William Pepper Constable and John D. Alexander, attorneys of Baltimore, were employed by Mr. Stannard, the appellee, to represent him in searching the title and in the settlement of the properties here in question. Messrs. Constable and Alexander communicated with Messrs. Ciotti and Slingluff and contracts were prepared by Mr. Ciotti and were delivered with a letter dated September 18, 1946, to the offices of Constable and Alexander. For the purposes of this case, we will assume that a valid and enforceable contract was entered into on September 18, 1946, for the sale of the properties in question by the Nowland heirs to the appellant for twelve thousand dollars.

On September 20, 1946, Mr. Stannard, the appellant, came to Mr. Alexander's office and was informed that the $12,000.00 sale "was off". Because of the refusal to complete the sale a suit for specific performance was filed in the Circuit Court for Cecil County on September 21, 1946, by Stannard against the Nowland heirs which resulted in the decree of September 2nd, 1947, ordering specific performance of the contract. No appeal was taken and a deed was executed and settlement has been made.

On December 4, 1947, the present suit was filed by the appellant against the appellee by a declaration alleging the ownership by the Nowland heirs of the properties in question, the contract entered into by the Nowland heirs with the appellant for the purchase of the properties for the price of $12,000.00; "that thereafter, the Defendant, John W. McCool, *knowing of the aforesaid contract between the Plaintiff*" and the Nowland heirs for the price of $12,000.00 induced them to refuse to carry out the terms of said contract and further induced the Nowland heirs to enter into a contract with the said Defendant for the purchase of said property for the sum of $12,200.00; "that said action on the part of the Defendant was a malicious and illegal interference with the contractual rights of the Plaintiff and was done with the intention on the part of the Defendant of injuring

the Plaintiff and of obtaining a benefit for the Defendant; that it became necessary for the Plaintiff to employ counsel and file suit in this Honorable Court to require the specific performance" of said contract with the Nowland heirs; "that as a result of the aforesaid unlawful and malicious conduct on the part of the defendant, the plaintiff has been greatly damaged and injured and was required to spend large sums of money for counsel fee and other costs and expenses." (Italics supplied). The plaintiff asked for $10,000.00 damages.

On February 16, 1948, Mr. McCool entered a counter suit against Mr. Stannard for malicious and illegal interference with his contractual rights with the Nowland heirs as a result of which his $9,000.00 contract was cancelled. The trial court entered a judgment on the counter claim in favor of Stannard for costs and no appeal is taken from that judgment. The original suit now before us was, after denial of a motion for a directed verdict, submitted to the jury who brought in a verdict in the amount of $650.00 for the appellant, Stannard. From a judgment N. O. V. setting aside that verdict, the appellant appeals.

The agreement between the Nowland heirs and Mr. Stannard, having been entered into on September 18th and rejected by them on September 20th, any action on the part of Mr. McCool in knowingly interfering with that contract must necessarily have occurred between September 18th and September 20, 1946. The trial judge based the granting of the motion on the fact that he was "unable to find any evidence to establish that the defendant had knowledge prior to September 20th, 1946, that a binding legal contract of sale had been entered into between the owners of the lots in question and the Plaintiff or any evidence from which such interference could be fairly and reasonably deduced."

Mr. Alexander testified that prior to September 18, 1946, Mr. McCool called him from Elkton. Mr. Alexander said: "I am not certain whether Mr. McCool asked for Mr. Constable or myself, but Mr. Constable had not

returned from vacation at that time, so I talked to Mr. McCool over the telephone and, of course, I don't have the exact words, but the substance of the conversation, the best of my recollection, is this. Mr. McCool said, 'Do you people represent Mr. Stannard?' I answered 'Yes', and he said, 'Well, you know the people down in Cecilton don't want Mr. Stannard to have those properties. They want me to have them', and 'If you and Mr. Constable represent Mr. Stannard in this matter it isn't going to do your firm any good in that part of the County'. I think I recall replying, 'Mr. McCool, are you asking that we represent you?' 'Oh,' he said, 'Oh, no, no, but only that it would be bad for you if you represent Stannard in this matter', and there were probably a few other things said. I think something was said by Mr. McCool, 'Well, you will get a big fee from him. Hit him hard', and I told him that we would charge him a reasonable fee for our services, but we had received nothing from him at that time. I did tell Mr. McCool we would represent Mr. Stannard to the best of our ability. That, as I recall, is the substance of the conversation."

Mr. Slingluff testified that on September 19th a wire was sent from his office which contained the language "Sentiment of residents against sale to Stannard". Mr. Slingluff said he received this information from a grocer in Cecilton, who said "he would offer to meet any price that Mr. Stannard would pay for those properties". Mr. Slingluff, when asked why the Stannard sale was called off, replied: "Because we received a wire from our local counsel for our clients instructing us to call it off". He said that he did not tell his clients to call off the sale, but that his clients did it "of their own volition". The following questions and answers occurred during Mr. Slingluff's testimony: "Q. Had you received the McCool offer of $12,200.00? A. Oh, yes. Q. Would that have had anything to do with it? A. I don't think so. I don't think the McCool offer of $12,200.00 was made until the 20th, was it? Q. What do you think

was the reason? A. I don't know, or shall I put it this way. I was Attorney-at-Law for those people and if I know the reason I must rely on my privilege. Q. Did you tell them to call it off? A. I did not tell them to call it off. Q. And you are relying on a privilege? A. I am relying on the privilege as to what I know of what their thoughts may have been." No question or ruling as to this claim of privilege is before us on this record.

Mr. Ciotti testified that neither Mr. McCool nor Mr. Short communicated with him between August 24th and September 20th. He said he complied with his clients' request and notified Mr. Alexander that the sale was off "and they had wired me and told me that the sale was off". He further said that McCool's offer of $12,200.00 was received after the preparation of the contracts for Mr. Stannard. When asked whether he told Mr. McCool that he had already prepared a contract for $12,000.00 for execution by Mr. Stannard, Mr. Ciotti replied: "I don't know whether I did or not. I will be frank and tell you this. I had no direct dealings with Mr. McCool." Mr. Ciotti, when asked the question: "You must have gotten word to him that there was a $12,200.00 offer from Mr. Stannard for the property, did you not?", answered: "I don't know whether I did or whether it came from the office or not. He may have known about it." When asked "Did you ever hear the fact that the residents of Cecilton didn't want Stannard to buy the property" he answered: "I had heard some statement, but I can't say who told me or how that came." On October 10th, 1946, a contract of sale was executed between the Nowland heirs and Carroll C. Short, Agent, for the sale of the properties in question for the sum of $12,200.00. This sale was never consummated.

William Pepper Constable, Esq., testified that he was in Elkton on Saturday, September 28, 1946 and Mr. McCool called him in his office. The suit for specific performance had been filed. Mr. Constable testified that Mr. McCool said: "he had a check he had given to Maryland and Virginia Farm Agency, Inc., for

$1,000.00, dated August 26th, 1946, as a deposit on the seven lots at Cecilton of this Nowland Estate. He showed me the check and the check was endorsed by the Maryland-Virginia Farm Agency, Inc., for deposit with the Equitable Trust Company of Baltimore, and I think to the credit of that Farm Agency under an agency account." Mr. McCool showed him the check but no contract.

The case of *Knickerbocker Ice Company v. Gardiner Dairy Company,* 107 Md. 556, 69 A. 405, 16 L. R. A., N. S., 746, involved a suit by the Gardiner Dairy Company against the Knickerbocker Ice Company for causing the Sumwalt Ice and Coal Company to break a contract with Gardiner. This Court said in that case, 107 Md. at pages 567 and 568, 69 A. at page 409: "Again the mere fact that a party acts from a bad motive or maliciously does not necessarily make him liable. If he has the right to act, his motive in acting cannot of itself make his act wrongful, but if he had no right to procure a breach of contract and resorts to unlawful means in doing so, he is liable to the injured party. We say 'unlawful means' because a party may be the means of causing a contract to be broken, and still not be liable. To illustrate, A may advertise his goods for sale at such a low rate as to result in a breach of contract by B, who was under contract with C, to buy at a higher price, but that would not make A liable to C, or to make the illustration more apt, if the Knickerbocker Company had simply refused to furnish the Sumwalt Company with ice the Gardiner Company would not for that reason alone have a remedy against the Knickerbocker Company. Such action would not necessarily be unlawful or wrongful, but if the Knickerbocker Company refused to furnish the Sumwalt Company if it furnished the Gardiner Company, *although it knew it was under contract to do so,* in order to get the business of the Gardiner Company for itself on its own terms, then it was unlawful to thus interfere with the contract

between the Sumwalt Company and the Gardiner Company." (Italics supplied).

The case of *Cumberland Glass Manufacturing Company v. DeWitt,* 120 Md. 381, 87 A. 927, was an action for damages for causing the breach of another's contract. In an opinion in that case, in which all of the then leading authorities were reviewed by Judge Burke, including the case of *Knickerbocker Ice Co. v. Gardiner Dairy Co., supra,* and the *Sumwalt Ice Co. v. the Knickerbocker Ice Co.,* 114 Md. 403, 80 A. 48, this Court concluded, quoting in part: " 'that it is a violation of legal right to interfere with contractual relations recognized by law if there is no sufficient justification for the interference.' Malice in this form of action does not mean actual malice, or ill will, but consists in the intentional doing of a wrongful act without legal justification or excuse." [120 Md. 381, 87 A. 2d 931.] The Court further said in that case: "Turning now to an examination of the facts appearing in the record, we find evidence tending to establish the contracts between the plaintiff and the Mallard Distilling Company. Did the defendant know of these contracts, and did it intentionally cause the Mallard Company to break them? These are questions of fact. It is not the province of this Court to decide these questions. We are merely to determine whether the plaintiff offered evidence from which the jury might have reasonably found that the defendant had this knowledge and that it intentionally procured their cancellation."

The appellant relies on the following from Restatement Of The Law of Torts, Volume 4, Section 766: "Except as stated in Section 698 [not applicable] one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or, (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby." This statement is qualified by comment (e) thereunder, which states: *"Actor's knowledge of other's expectancy.* To be subject to liability

618 ·

under the rule stated in this Section, the actor must have knowledge of the business expectancy with which he is interfering. This is true whether the expectancy is one described in Clause (a) or in Clause (b). Thus, although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise purposely cause that failure if he has no knowledge of the contract. But it is not necessary that the actor appreciate the legal significance of the facts which give rise to the contractual duty. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means something other than what it is judicially held to mean." There is no evidence in the case before this Court that the appellee had knowledge of the facts creating the contract between the appellant and the Nowland heirs.

The appellant further strenuously argues that the failure of Mr. McCool to testify should itself take the case to the jury. To support this contention he relies on the cases of *Cueva Company v. Williams and Company,* 145 Md. 526, 125 A. 849; *Arthur and Boyle etc. v. Morrow Brothers,* 131 Md. 59, 101 A. 777, L. R. A. 1918 A, 400; and the following quotation from the case of *Macht v. Hecht Company,* 191 Md. 98, at page 101, 59 A. 2d 754, 755: "It is doubtless true that in the course of a trial upon the merits the court may be called upon to rule upon questions of evidence, and to apply the rules as to burden of proof in evaluating the evidence presented. 'The duty to go forward may of course shift and alternate as evidence is introduced or presumption arises.' " In reference to this argument it is only necessary to say that the appellant has made out no *prima facie* case that the appellee had any knowledge of the $12,000.00 contract between the appellant and the Nowland heirs, nor has he presented any evidence to create such a presumption.

From the evidence in this case, it appears that as the result of the offer made by Mr. Stannard to the Nowland

heirs, the McCool contract in the amount of $9,000.00 was rejected, without any knowledge on the part of Stannard that such a contract was in existence. It also appears that probably as a result of Mr. McCool's offer of $12,200.00, the Nowland heirs attempted to rescind the contract with Mr. Stannard. There being no evidence in this case from which the jury might reasonably have found that the appellee had knowledge of the facts which created the twelve thousand dollar contract or of the contract, entered into between the appellant and the Nowland heirs, and that knowledge being essential to a recovery of a judgment in this case, the trial judge was clearly correct in entering the judgment N. O. V.

*Judgment affirmed, with costs.*