## PHILIP E. GRAY, INC. *v.* GRAY

[No. 50, October Term, 1952.]

*Decided January 8, 1953.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Wm. Meverell Loker, Jr.*, with whom were *Wm. Meverell Loker, Loker and Guyther, Rouse and Morton* and *James C. Morton, Jr.* on the brief, for appellant.

*Wm. J. McWilliams*, with whom were *McWilliams, Evans* and *Melvin, Joseph D. Weiner* and *D. Sylvan Friedman*, on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment in the amount of $7,797.12 rendered against the appellant, Philip E. Gray, Incorporated, and in favor of the appellee, Margaret W. Gray. The suit was in assumpsit for services rendered by the appellee, plaintiff, to the appellant, defendant, in that amount.

The case comes to this Court on the denial of the appellant's motion for a directed verdict and on the refusal of appellant's motion for a judgment N. O. V. Of course, in deciding whether this demurrer prayer and motion should have been granted, we will resolve all conflicts in the evidence in favor of the appellant and assume the truth of all evidence and all inferences which may naturally and legitimately be deduced therefrom which tend to support appellant's claim. The evidence will therefore be recited in a light most favorable to the appellant. *Stannard v. McCool*, 198 Md. 609, 610, 84 A. 2d 862, 863, and cases there cited.

Margaret W. Gray, the appellee, testified that she and Philip E. Gray were married at Roanoke, Virginia, on August 3, 1935. They lived in Roanoke for three years and then moved to Charlottesville and lived there until

they were divorced in 1947. Mr. Gray was in the coin machine business in Virginia and about 1942 transferred his operations to St. Mary's County, Maryland. The Grays have two children, a girl fifteen and a boy nine years of age at the time of the trial. Prior to the divorce an agreement was reached by the parties that Mr. Gray was to pay her fifty dollars per month for herself and two hundred dollars for the children. The children went to live with Mrs. Gray's parents in Roanoke and Mrs. Gray went in training in Charlottesville to become a nurse. When the boy became ill Mrs. Gray went back to Roanoke to take care of the children. Mr. Gray kept in touch with his former wife and his children. Some time before June, 1948, Mr. Gray suggested that they try to "make a go of it again" and that they re-marry. On the way back to Maryland, Mrs. Gray told him at Union Station in Washington that she and the children would not go back unless she and he were married. Mr. Gray, however, persuaded her to go back to St. Mary's County with the promise of marriage some time in the future. In July, 1948, they all returned to St. Mary's County to a house in Patuxent Park, where Mr. Gray had his slot machines stored in the basement. In this house one room was used as an office, one room was occupied by two boys who worked for Mr. Gray, and the family occupied a living room, kitchen, and three upstairs bedrooms. Mr. and Mrs. Gray occupied one bedroom as man and wife. In September, 1948, Mr. Gray formed the corporation, Philip E. Gray, Inc. The corporation employed Mrs. Gray in the fall of 1948 "to take care of the books, which was just a ledger, that he kept on the slot machines take, not pertaining to any of his other bookkeeping, and keep the office and take telephone calls and so forth and keep the place clean." She was to be paid a salary of one hundred dollars a week. They later moved from this office to another house three doors away, where they established a home. Mrs. Gray said she then took care of this home and "went back and forth and kept the office going like I had always

done, and it wasn't until September of the following year, 1949, that we moved into the hotel; I have been running the hotel since the middle of September, and I found that running the hotel and handling the home and looking after the children, I couldn't do both jobs, so we took six rooms there at the hotel, and made it into a five room apartment." She had entire management of the hotel which consisted of about one hundred bedrooms, without a dining room. Six maids and a maintenance man were employed. Mrs. Gray said: "We had it set up, a bell system, where, in case I wasn't in the office, that they could ring back into the apartment, if I was back in the apartment, taking care of that, * * *". She took in the money and paid most of the bills. There was no bank account. All the transactions were in cash. She said she never received any of her salary from the corporation. She said she asked her husband for her salary, but he never paid it. She continued to hope he would marry her. Finally in May, 1950, she discovered that her husband had been telling people they were not married and he "wouldn't give me anything to go on except he handed out to me as I needed it," and being convinced that he would not marry her, she quit her employment. She entered this suit on November 30, 1950.

She said from time to time during her employment she received from her former husband money in cash as she needed it for food, clothes for the children, furniture for the house, clothing for herself and for him, groceries, doctor's bills for the children, and large doctor's bills for herself. She said this could have amounted to as much as $13,726.00. She said she was required to account for the money he gave her and for the money she received at the hotel and from other employees, Messrs. Hayden and Pennington. She said she accounted to Mr. Gray for all of the money he had given her in a composition book. She said the corporation owed her for salary, seventeen hundred dollars for the year 1948, fifty-three hundred dollars for the year 1949, and

two thousand dollars for the year 1950, less the necessary deductions for income taxes of $1,202.88, leaving a balance of $7,797.12 which had not been paid her. After she left the employ of the corporation she moved out of her former husband's bedroom and into the bedroom with her son. At the time of trial she was boarding with a Mr. and Mrs. Achenback and working in the A. & P. Store. She admitted that she signed income tax returns for 1948, 1949, and 1950. She said these returns were prepared by an accountant and she didn't read them after they were prepared but signed them because Mr. Gray asked her to do so. She further testified that during this period Mr. Gray did not pay her the two hundred dollars for the children and the fifty dollars alimony per month, but merely gave her money for expenses of the family and home. She said at the time she was not living with him, he made out to her each month a check for $50.00 and marked on it "alimony" and a check for $200.00 to her father for the children.

Mr. William W. Pennington, an employee of the appellant corporation, in his deposition, offered by the appellant, testified that when Mr. Gray was out of town he would advance Mrs. Gray money from his "change fund" and put a ticket in the change box showing the payments to Mrs. Gray. He said Mr. Gray did not object to this but asked him "to discourage her as much as I could". He said Mrs. Gray, for Philip E. Gray, Incorporated, during eight months of 1949 while he was employed there, did some book work, cleaned up the office, and operated an adding machine and typewriter. Mr. Gray told him that Mrs. Gray was on the payroll and he heard him discuss it with his accountant who was making up the income tax. He said he thought he heard Mr. Gray say that Mrs. Gray's salary was $100.00 per week.

Philip E. Gray testified that he was the president of the corporation and owned all its stock except for two shares. He said for the sake of the children, he and Mrs. Gray resumed living together in June, 1948. He

admitted that he and Mrs. Gray made an arrangement whereby she would receive one hundred dollars a week from the corporation. While she lived with him he said "she was to receive the additional money necessary" and that she was given additional money. He said that Philip E. Gray Incorporated paid to Mrs. Gray one hundred dollars per week while she was on the payroll. He further said: "I gave her one hundred dollars per week from the corporation, plus additional money as it was demanded by her." He said during the period she worked for the corporation "in round figures I gave her thirteen thousand five hundred dollars". He further said: "I advanced her corporation money to the extent of one hundred per week only; any other money she received from me, came from me. I asked only that one hundred dollars per week be set off against what she got; she got far in excess of one hundred dollars a week, but the corporation only extended her one hundred dollars a week." Apparently appellant had no record of the payment of Mrs. Gray's salary other than an envelope upon which was written a memorandum each month of its expenditures. Inside the envelope were receipts for these expenditures, other than the employees' salaries. There were no receipts or vouchers from any of the employees showing that their salaries were paid. There were no checks showing the payment of appellee's salary, as all payments were made by the corporation and Mr. Gray in cash. Mr. Gray testified that the social security records and unemployment records would show the corporation reported the payment of Mrs. Gray's salary by the corporation. There is no evidence here that Mrs. Gray made these reports.

From this testimony it is not disputed that Mrs. Gray was employed by Mr. Gray for the corporation at one hundred dollars a week to do certain work, which she performed, and that she earned her salary of one hundred dollars per week. Mr. Gray admitted that while she lived with him he agreed to pay her "the additional money necessary". She admits that Mr. Gray

might have paid her as much as $13,726.00 but that this was the "money necessary" for the living expenses, clothes, medical expenses, furniture, and other necessities for the family, and did not include her salary from the corporation. Mr. Gray says that this amount paid by him included her salary from the corporation. He has no receipts, vouchers, or checks to substantiate this contention. It was certainly a jury question as to whether Mrs. Gray had been paid her salary in full and if not, how much was due her. There are no objections to the instructions given the jury by the trial judge. Under the testimony here the court could not have ruled as a matter of law that Mrs. Gray's salary had been paid in full as appellant here contends.

The appellant relies on the case of *Provident Trust Company v. Massey*, 146 Md. 34, 125 A. 821, in which the appellee sued for service rendered. It was there said that as a general issue plea was filed and non-payment was a necessary allegation, it was incumbent upon the plaintiff to offer evidence tending to prove non-payment. *Gill v. Donovan*, 96 Md. 518, 54 A. 117. In that case a demurrer prayer was filed. This Court there reaffirmed the well known principle that the effect of filing a demurrer prayer is to admit the truth of the plaintiff's evidence and every inference properly deducible therefrom. Here we have affirmative evidence from the plaintiff that she accounted to Mr. Gray for all the money he gave her and that the defendant corporation had not paid any of her salary. In *Lynch v. Rogers*, 177 Md. 478, 10 A. 2d 619, the appellee, plaintiff, filed a suit in *assumpsit* for domestic services rendered by the plaintiff to the defendant's testator during the latter's lifetime. The principal question in the case was whether the defendant's demurrer prayer should have been granted. In support of this prayer the defendant urged that the testimony on the part of the plaintiff failed to show affirmatively that the defendant's testator had not paid the plaintiff in his lifetime for her services. Judge Parke in that case, after giv-

ing other reasons why the demurrer prayer should not have been granted, said at page 482: "and, thirdly, the general rule is that payment is a matter of defense, and so affirmative testimony by the plaintiff of non-payment for services rendered is not ordinarily a necessary part of the plaintiff's right to recover." In the case now before this Court we have affirmative testimony by the plaintiff of non-payment for services rendered.

In *Weil v. Lambert,* 183 Md. 233, 37 A. 2d 312, an action in *assumpsit* was brought against the administrator of an estate for compensation for services rendered, among other items. This Court there said, 183 Md. at page 243, 37 A. 2d at page 316: "While the lapse of time may raise of itself at common law a presumption of payment, the presumption will not arise if the length of time is not at least twenty years unless the circumstances of the particular case are such as to raise a presumption of payment. *Provident Trust Co. v. Massey,* 146 Md. 34, 125 A. 821; *Morse v. National Central Bank,* 150 Md. 142, 147, 132 A. 598; *Lynch v. Rogers,* 177 Md. 478, 486, 10 A. 2d 619; 22 *Am. & Eng. Ency of Law,* 2d Ed., 596; *Wigmore on Evidence,* 2d Ed. Sec. 2517. The court does not, of course, consider the weight of the evidence which is a matter exclusively for the jury. It is only concerned with the question of the legal sufficiency of the evidence. *Hartford National Bank v. Rutledge,* 124 Md. 46, 65, 91 A. 790. If there is any evidence, however slight, legally sufficient as tending to prove the matters alleged, that is to say, competent, pertinent and coming from a legal source, the weight and value of such evidence will be left to the jury." Of course, there is no question of lapse of time in the instant case.

Finding no error, the judgment will be affirmed.

*Judgment affirmed, with costs.*