# KNICKERBOCKER ICE COMPANY *vs.* GARDINER DAIRY COMPANY.

*Liability for Inducing Breach of Contract Between Third Parties—Exemplary Damages Not Recoverable When no Express Malice—Construction of Contract—Evidence—Telephone Conversation.*

A person who knowingly and without just cause induces one of the parties to a contract to break it, is liable in an action to the other party for the injury so occasioned.

The plaintiff, a dairy company, had a contract with the S. Ice Company by which the latter agreed to supply plaintiff with ice during a certain season at a designated price. The S. Company procured large quantities of ice from the defendant, a company manufacturing ice, and the defendant knowing of the existence of the contract between the plaintiff and the S. Company, and intending to obtain a benefit for itself, notified the S. Company that if it sold ice to the plaintiff, the defendant would refuse to supply any ice to it. Consequently, the S. Company broke its contract with the plaintiff, and the plaintiff was compelled to purchace ice from the defendant at a higher price than that stipulated for in its contract with the S. Company. *Held*, that defendant is liable for the loss thus caused to the plaintiff.

*Held*, further, that since there is no evidence of express malice towards the plaintiff company on the part of the defendant company, and the latter's purpose was to benefit itself and not chiefly to injure the plaintiff, a prayer is erroneous which instructs the jury that if they find that the defendant acted maliciously, that is to say, with a wanton disregard of the plaintiff's rights, then they are at liberty to award such additional amount by way of exemplary damages as will in their judgment be required to prevent the repetition of such conduct on the part of the defendant in the future.

When the defendant caused a party to a contract with the plaintiff to break it merely for the purpose of benefiting himself and not for the purpose of injuring the plaintiff, there can be no recovery of exemplary damages for such unlawful interference with the plaintiff's contract.

The contract for the supply of ice between the defendant, a manufacturing company, and the S. Company a dealer in ice, provided that the latter should not sell to, or interfere with the customers or trade of defendant.   The plaintiff had occasionally purchased ice from the defendant but had no contract with it at the time when an agreement was made between the plaintiff and the S. Company for a supply of ice by the latter to the former.   *Held,* that the plaintiff was not a customer of the defendant within the meaning of the contract between the defendant and the S. Company.

The construction of a written contract is for the Court, and the jury should not be authorized to ascertain its true meaning.

A receipted bill for goods sold is admissible in evidence to show the existence of a contract between the parties.

When one calls up on the telephone the office of an individual or corporation and is answered by a person who says that he represents that individual or corporation, and proceeds to conduct a negotiation, the presumption is that that person is authorized to act, although he is not recognized or known by the other speaker.

When in consequence of an order so given goods are delivered, that is evidence that the person talking over the telephone and receiving the order was authorized to act.

When evidence has been admitted subject to exception and no motion to exclude is afterwards made, it must be treated as being properly in the case.

*Decided March 31st, 1908.*

Appeal from the Court of Common Pleas of Baltimore City, (HARLAN, C. J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER and WORTHINGTON, JJ.

*Edward C. Carrington, Jr.,* (with whom was *Campbell Carrington* on the brief), for the appellant.

*Randolph Barton, Jr.* and *Aubrey Pearre, Jr.,* (with whom were *Barton, Ambler* and *Stewart* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered against the appellant in favor of the appellee for causing the Sumwalt Ice and Coal Company to break a contract between it and the appellee by which the former had agreed to furnish the latter with ice. As the first question to be considered is a demurrer to the declaration, which was overruled, we will state the material allegations made in it. It is alleged that the plaintiff was engaged in the dairy business in June, 1906, and required a large quantity of ice, during the spring and summer months; that, in order to meet its requirements, it entered into a contract with the Sumwalt Company, whereby that company contracted to deliver to the plaintiff, and the plaintiff agreed to buy from it an amount not exceeding twenty tons of ice each day from the date of the contract until the completion of the plaintiff's plant then in course of construction, at the price of $5 per ton, delivered; that, at the time, the Sumwalt Company was purchasing ice in large quantities from the defendant, which was engaged in the manufacture of ice; that the defendant, learning of the contract between the plaintiff and the Sumwalt Company, notified the latter that it would refuse to deliver any ice whatever to it, unless it refrained from delivering ice to the plaintiff; that said Sumwalt Company being compelled by the exigencies of its business to secure ice from the defendant, and being alarmed by the threat of the defendant, broke its said contract with the plaintiff and advised it that, because of the action of the defendant, it could not carry out its contract with the plaintiff; that thereby the plaintiff was compelled to purchase ice directly from the defendant at a price considerably greater, and on terms considerably less advantageous to it, than it was enjoying under its contract with the Sumwalt Company.

It is further alleged that the action of the defendant in causing the Sumwalt Company to break its contract with the plaintiff "was with the desire and intention on the part of the defendant of injuring the plaintiff and of obtaining a benefit for itself, that said action was deliberate and malicious, and

inspired by the wish and purpose to force the plaintiff to buy ice directly from the defendant at a larger price, in larger quantities and for a longer period, than were required of the plaintiff under the terms of its aforesaid contract with the Sumwalt Ice and Coal Company. By which unlawful and malicious action on the part of the defendant the plaintiff has been greatly damaged."

There is a great conflict between Judges and law-writers as to how far there is a remedy for interference with contract relations, and it would be a useless task to undertake to reconcile them. They quite generally agree in their conclusions when the relation of master and servant exists, but even then reach the same point by different routes. *Lumley* v. *Gye*, 2 E. & B. 216, is the leading case on the subject. Prior to the dissenting opinion delivered by JUSTICE COLERIDGE in that case, it seems to have been assumed that the action for enticing servants was a common law action, but in that opinion he asserted, and with his marked ability undertook to establish, that such was not the case and that it was founded on the *Statute of Laborers*, 23 Edw. 3, and that both on principle and authority was limited by it. But however that may be, that statute was never in force in this State and could not have been applicable to conditions here, and the right to such action has always been regarded as a part of the common law. JUSTICE COLERIDGE also undertook to show that the general rule of the English law in respect to breaches of contracts was to confine its remedies by action to the contracting parties, but while it may be conceded that, as a rule, such actions had been confined to those parties, it does not follow that the right of action in third parties did not exist. In *Lumley* v. *Gye*, there was a demurrer to each of the three counts in the declaration, and it was held by JUDGES WIGHTMAN, ERLE and CROMPTON, quoting from the syllabus, that "the counts were all good, and that an action lies for maliciously procuring a breach of contract to give exclusive personal services for a time certain, equally whether the employment has commenced or is only *in fieri*, provided the procurement be during the

subsistence of the contract, and produces damage; and that, to sustain such an action, it is not necessary that the employer and employed should stand in the strict relation of master and servant. Semble, by the same Judges, that the action will lie for the malicious procurement of the breach of any contract, though not for personal services, if by the procurement damage was intended to result and did result to the plaintiff."

In *Ensor* v. *Bolgiano*, 67 Md. 190, Mr. Ensor, an attorney, sued the defendant, alleging that, with malice towards the plaintiff, he induced one Allen to compromise his case against a turnpike company in which the defendant had stock, and to break his contract with the plaintiff to pay him a contingent fee. This Court disposed of the case on the ground that there was no legally sufficient evidence to support the action, and declined to express any opinion on the law as laid down in *Lumley* v. *Gye*—although JUDGES YELLOTT and BRYAN filed dissenting opinions in which they approved of the doctrine announced in that case.

In *Lucke's case*, 77 Md. 396, it was held that where an employee, who was performing the duties of his position to the entire satisfaction of his employers, was discharged in consequence of a threat from a labor organization that if he was longer retained, it would be compelled to notify all labor organizations of the city that the business house of the employers was a non-union one, and thus subject them to a great loss, such interference was wrongful and an action would lie against the labor organization by the employee, for the damage he sustained in consequence of such discharge. The evidence showed that the employee was to continue in the employ of his employers as long as his work was satisfactory, but they reserved the right to discharge him at the end of any week. A member of the firm testified that they would not have discharged him except for the objections by the appellee. This Court quoted with approval from *Benton* v. *Pratt*, 2 Wendell, 385, that "Where a contract would have been fulfilled but for the false and fraudulent representations of a third person, an action will lie against such person, although the con-

tract could not have been enforced by action." It also quoted at length from *Chipley* v. *Atkinson*, 23 Fla. 206, which said neither the fact that the term of service interrupted was not for a fixed period, nor that there was a right of action against the person induced or influenced to terminate the service, or to refuse to perform his agreement, was of itself "a bar to an action against the third person maliciously and wantonly procuring the termination of, or a refusal to perform, the agreement. It is the legal right of the party to such agreement to terminate or refuse to perform it, and in doing so he violates no right of the other party to it; but so long as the former is willing and ready to perform it, it is not the legal right, but is a wrong on the part of a third party maliciously and wantonly to procure the former to terminate or refuse to perform it." The Court also quoted from *Bowen* v. *Hall*, L. R. 6 Q. B. D. 338, which we will refer to later. It said that the Lucke case and that of *Lumley* v. *Gye*, "widely differ in important facts, and there is but small analogy in the principles of law properly applicable in each case," but it will be observed that it announced principles which are analogous to those sought to be applied in this case. It distinctly held that an action by an employee would lie against a third person, who maliciously and wantonly procured the termination of the arrangement between the employer and employee, which was not for a definite period, and the facts show that Lucke was not a mere menial servant but a skilled "first class customs cutter."

Some material distinctions between that case and the one before us are apparent, but it does go one step further than the cases usually found in the books, in which the relation of master and servant or employer and employee is in any way involved, and there was not, as here, a binding contract between the parties. Generally speaking such suits have been by the master for the enticement of his servant, while the Lucke case was by an employee against a third person for causing his discharge by the employer, and it is difficult to see why, upon principle, a party to a contract should be con-

fined to an action against the other party for a breach of it, when a third party has been the deliberate cause of the breach, for his own selfish or malicious purposes.    To say that he has his remedy against the other contracting party is in many cases offering a mere shadow for substance, for oftentimes he may have his trouble for his pay, as the other party to the contract may be financially irresponsible.    Why should a labor organization, which has the right to organize and act for the protection and benefit of its members, so long as it does not infringe upon the rights of others, be responsible for causing the discharge of one who it believes interferes with the interests of its members by being so employed, while an employer of labor can maliciously and wantonly, or for his own selfish purposes, cripple another employer with impunity?    If the Clothing Cutters and Trimmers Assembly was liable for causing the New York Clothing House to discharge Lucke why should not some importer, or wholesale dealer, have been liable to that house if he had procured some other importer, or dealer, with whom it had a contract, and upon whom it was dependent to secure such goods, to break his contract with that house, and thereby force it to deal on disadvantageous terms with the procurer?    Such distinction, based on the technical ground that the relation of master and servant exists in the one case and not in the other, would be well calculated to impress laborers with the belief that the law discriminates between labor and capital—making the one responsible but not the other.    Trusts and combinations of capital have ruined many while hiding behind means apparently lawful, but if they cannot be reached when it is shown that they have maliciously and wantonly, or for their own selfish purposes, not only prevented others from making contracts, but compelled contractors to break their contracts, then indeed is the law helpless.    Yet that is just what the theory of the appellant, if adopted, might lead to, and it should not be adopted unless clearly within well established principles of law.    And when we are called upon to determine that question, we are not to be governed entirely by the lack or scar-

city of precedents furnishing a remedy.   Principles of law ought not to be stretched beyond reason and justice, but they ought not unnecessarily to be so contracted as to allow them to be made use of as instruments of oppression.

This Court quoted in Lucke's case from *Winsmore* v. *Greenbank*, Willes Rep. 581, where it was said, "special action on the case was introduced for the reason that the law will never suffer an injury and a damage without a remedy." In *Bottomly* v. *Bottomly*, 80 Md. 162, JUDGE BRYAN stated that; "where it is said that when the plaintiff has a right he must have a remedy, if he is injured in the enjoyment of it; it must necessarily be understood that the injury must be an act which is unlawful in itself, or that it is rendered unlawful by the circumstances under which it is committed."

And in speaking of Lucke's case he said, "We held that the conduct of the defendant was malicious and unlawful, and that it gave the plaintiff a good cause of action. It was a scheme to accomplish an unlawful result by unlawful means."

So in *Gore* v. *Condon*, 87 Md. 368, after stating the facts fully, JUDGE BRISCOE, in delivering the opinion of the Court, said: "The question then is, whether the conduct of the defendant under the circumstances stated in this case constituted such a wrongful act, as will give rise to an action for damages." In that case the plaintiff was the owner of some houses and lots, and the defendant obtained a mortgage thereon from a person he knew was not the owner, and although knowing that the mortgage was fraudulent and void, caused the tenants of the property to cease paying their rents to the plaintiff, and advertised the property for sale under an *ex parte* decree of foreclosure on the mortgage, which was afterwards vacated by a Court of equity, The tenants moved away and the plaintiff lost the rents. It was held that "if a man *knows* that certain property is not his but another's, and that his apparent title to the same was acquired by fraud and is void, then his intermeddling with such property to the damage of the real owner is an unlawful act for

which an action lies." It was also said, "The right to maintain the action can also be sustained, upon the doctrine that a man who induces one of two parties to a contract to break it, intending thereby to injure the other or to obtain a benefit for himself, does the other an actionable wrong"—citing *Lucke's case*, *Angle* v. *Chicago &c. Ry.*, 151 U. S. 14, *Lumley* v. *Gye*, *Bowen* v. *Hall*, *supra*, and *Walker* v. *Cronin*, 107 Mass. 555. It cannot be denied that it is unlawful for a party to a contract to break it, unless, of course, he has sufficient ground for doing so, and therefore when a third party procures or induces him to do so, he is causing him to do an unlawful act, which is itself unlawful, and the law ought to afford a remedy to the injured party.

In the appendix to 87 Md. there is a note on *Gore* v. *Condon*, by Mr. Brantly, which considered at length the subject of interference with contracts, etc., with his usual clearness. Some of the questions discussed in that note are not involved in this case—for example, the distinction made by some authorities between preventing a contract being made and causing one already made to be broken. This declaration distinctly alleges that a contract had been made, and that the defendant caused the Sumwalt Company to break it, and there is testimony tending to sustain those allegations. In Lucke's case it was held that the defendant was liable although there was no contract in force, requiring the employers to continue his employment, but that part of the decision relied on the discharge, connected with the fact that he would have been continued but for the threats and action of the defendant. In addition to the authorities cited in *Gore* v. *Condon*, *supra*, there are many others in which it has been held that procuring a breach of an existing contract is actionable. In *Perkins* v. *Pendleton*, 90 Me. 166 (S. C. 38A. 96), the Court cited with approval *Lumley* v. *Gye*, and *Bowen* v. *Hall*. After quoting at length from the latter it said: "The doctrine of these cases has been very generally adopted, and the cases themselves very frequently cited, by the Courts of this country," citing a number of them, and added, "In view of these

authorities and others, which it is not necessary to refer to, it must be conceded that for a person to wrongfully—that is, by the employment of unlawful or improper means—induce a third party to break a contract with the plaintiff, whereby injury will naturally and probably, and does in fact, ensue to the plaintiff, is actionable; and the rule applies both upon principle and authority as well as to cases where the employer breaks his contract as where it is broken by the employee; in fact it is not confined to contracts of employment." The Court cited *Walker* v. *Cronin*, *Chipley* v. *Atkinson*, *Lucke's case*, *Raycroft* v. *Tayntor*, 68 Vt. 219, and others. See also *Jones* v. *Stanley*, 76 N. C. 355.

The English cases have for the most part sustained *Lumley* v. *Gye*. In *Bowen* v. *Hall*, *supra*, JUDGE BRETT and LORD CHANCELLOR SELBORNE delivered opinions affirming *Lumley* v. *Gye*, LORD COLERIDGE, C. J., dissenting. JUDGE BRETT said that the decision of the majority in that case held that, "wherever a man does an act which in law and in fact is a wrongful act, and such an act as may, as a natural and probable consequence of it, produce injury to another, and which in the particular case does produce such an injury, an action on the case will lie." And again he said: "Merely to persuade a person to break his contract may not be wrongful in law or fact, as in the second case put by COLERIDGE, J. But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it. We think that it cannot be doubted that a malicious act, such as is above described, is a wrongful act in law and in fact."

In *Allan* v. *Flood* (1898) A. C. 1, a conclusion was reached which is not in accord with Lucke's case, but *Lumley* v. *Gye*, was not overruled, although commented on in the opinions filed. In *Quinn* v. *Leathem* [1901], A. C. 495, LORD MACNAGHTEN, in referring to *Lumley* v. *Gye*, said, "Speaking for myself, I have no hesitation in saying that I think the de-

cision was right, not on the ground of malicious intention—that was not I think the gist of action—but on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognized by law if there be no sufficient justification for the interference." LORD LINDLEY also expressed the same views. In *South Wales Miners Federation* v. *Glamoyan Coal Co.* [1905], A. C. 239, it was held that, "Procuring a breach of contract is an actionable wrong unless there be justification for interfering with the legal right," and *Lumley* v. *Gye*, was cited with approval by LORD LINDLEY, while in the other opinions it was not questioned.

It would seem therefore that *Lumley* v. *Gye*, has never been overruled in England, but is the leading case on this general subject. It has been adopted or cited with approval in a number of cases in this country, including *Gore* v. *Condon*. It is not altogether easy to lay down general rules as established by the cases but some principles are quite well settled by them. It may be safely said that if wrongful or unlawful means are employed to induce the breach of a contract, and injury ensues, the party so causing the breach is liable in an action of tort. While lawful competition must be sustained and encouraged by the law, it is not lawful, in order to procure the benefit for himself, for one to wrongfully force a party to an existing contract to break it, and a threat to do an act which would seriously cripple, if not ruin, such party, unless he does break it, is equivalent to force, as that term is used in this connection. We say "wrongfully" force, because the procurer would not be liable if he had the right to compel the party to break his contract. For example, if the contract between the Knickerbocker Company and the Sumwalt Company, prohibited the latter from selling ice to any customer of the former and the Gardiner Company was a customer within the meaning of the contract, it would not necessarily be wrongful for the Knickerbocker Company to refuse to deliver ice to the Sumwalt Company for the Gardiner Company. In other words it has the right to protect its own contracts, and merely

because its action in that respect would result in the Sumwalt Company not being able to furnish the Gardiner Company would not make the Knickerbocker Company liable to the latter, but if the object of Knickerbocker Company was merely to procure the trade of the Gardiner Company, and for that purpose threatened to refuse to furnish the Sumwalt Company with ice unless it violated its contract with the Gardiner Company, although there was no contract between the Knickerbocker Company and the Sumwalt Company, which prohibited the latter from selling to the Gardiner Company, then the Knickerbocker Company would be liable to the Gardiner Company for injury sustained by it for breach of the contract by the Sumwalt Company so procured.    That is an illustration of what is meant in the *South Wales Miners Federation case*, *supra*, where it is said that "Procuring a breach of contract is an actionable wrong, unless there be justification for interfering with the legal right."

Again the mere fact that a party acts from a bad motive or maliciously does not necessarily make him liable.    If he has the right to act, his motive in acting cannot of itself make his act wrongful, but if he had no right to procure a breach of contract and resorts to unlawful means in doing so, he is liable to the injured party.    We say "unlawful means" because a party may be the means of causing a contract to be broken, and still not be liable.    To illustrate, A may advertise his goods for sale at such a low rate as to result in a breach of contract by B, who was under contract with C, to buy at a higher price, but that would not make A liable to C, or to make the illustration more apt, if the Knickerbocker Company had simply refused to furnish the Sumwalt Company with ice the Gardiner Company would not for that reason alone have a remedy against the Knickerbocker Company.    Such action would not necessarily be unlawful or wrongful, but if the Knickerbocker Company refused to furnish the Sumwalt Company if it furnished the Gardiner Company, although it knew it was under contract to do so, in order to get the business of the Gardiner Company for itself on its own terms, then

it was unlawful to thus interfere with the contract between the Sumwalt Company and the Gardiner Company.

So without further pursuing that branch of the case we are of the opinion that the demurrer was properly overruled, as the declaration stated an actionable wrong, even if there had been no express allegation of malice.

The first prayer of the plaintiff sets forth the facts practically as alleged in the *nar.*, although it does not in terms submit the question whether the defendant acted maliciously. It did however require the jury to find that "the object of the defendant in so notifying the Sumwalt Company was to benefit itself at the expense of the plaintiff by compelling the plaintiff to buy from the defendant directly, at a price greater than paid the Sumwalt Company and not through the medium of the Sumwalt Company." Such an act is in accordance with the principles announced in *Gore* v. *Condon*, "an actionable wrong." Although many of the cases speak of the act as being maliciously done, it would seem to be clear that *express* malice is not necessary if the act is wrongful and unjustifiable. In *Walker* v. *Cronin*, 107 Mass. 555, which was before the Court on a demurrer to the declaration, there was no allegation of malice, and that Court held that the declaration was sufficient. It is true that the Court said that intentional and willful acts, calculated to cause damage to the plaintiffs in their lawful business, done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant, constitute malice, and in *Bowen* v. *Hall*, it was said by BRETT, J., that such an act as alleged in this declaration is a malicious act. See also *Perkins* v. *Pendleton, supra; Bixby* v. *Dunlap*, 56 N. H. 456. We do not think the special exceptions to it can be sustained, and we find no error in granting this prayer.

The second prayer of the plaintiff presents some difficulty. After authorizing the jury to award such damages as would compensate the plaintiff for pecuniary loss if it found for the plaintiff it goes on to say, "and if they shall further find and believe that the defendant acted maliciously, that is to say,

with a wanton disregard of all the plaintiff's rights, then they are at liberty to award such additional amount by way of exemplary damages as the circumstances in their judgment require to prevent the repetition of such conduct on the part of the defendant in the future."

In a suit between the parties to a contract the general rule is that whether it be an action *ex contractu*, or an action of tort, founded on the breach of the contract, the measure of damages is the same and under the control of the Court.    *B. & O. R. R. Co.* v. *Pumphry*, 59 Md. 390; *Same* v. *Carr*, 71 Md. 135; *Webster* v. *Woolford*, 81 Md. 329; *Thompson* v. *Clemens*, 96 Md. 207.    But it was said in Carr's case, which was an action of tort for wrongfully refusing to admit plaintiff to the car of the defendant, although he had a ticket, that, "In cases of this character, the jury can only give such damages as were the immediate consequences naturally resulting from the act complained of, with the right to allow exemplary damages for any malice, or the use of any unnecessary force, in the commission of the wrong alleged."    And in *Webster* v. *Woolford* the right to exemplary damages in some cases founded on contract was recognized.    But the difficulty is that there is no evidence of malice in this case, unless it be such as some of the cases speak of—that the intention to benefit the defendant, or to injure the plaintiff, is to be treated as evidence of malice.    But we have found no case in which exemplary damages were allowed for malice implied from such facts.    The facts stated in the first prayer are in our judgment sufficient to entitle the plaintiff to recover, but we do not think they authorize recovery of exemplary damages, and there was not sufficient evidence outside of those facts to authorize the submission of this prayer.    We do not mean to say there may not be such damages in cases of this character, for if, for example, there was evidence tending to show that the defendant had caused the contract to be broken for the sole purpose, and with the deliberate intention of wrongfully injuring the plaintiff, exemplary damages might be recovered, but when the object was merely to benefit itself, although the

plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it.    Unless there was injury to the plaintiff by the act of the defendant, no action would lie, and therefore such action must be based on injury.   We have found no case which would sustain the recovery of exemplary damages under such facts as are disclosed by the record, and do not think they ought to be allowed and there being a special exception to this prayer, raising the question, it ought to have been sustained, and the prayer should not have been granted.

It follows from what we have already said that the defendant's first prayer—that there was no legally sufficient evidence to entitle the plaintiff to recover—was properly rejected.   The defendant's second and third prayers can be considered together.    They rely on a provision in a contract between the Knickerbocker Company and the Sumwalt Company that the latter "will not, directly or indirectly, sell to or interfere with the customers or trade of the said" Knickerbocker Company. Both of them were faulty because they submitted to the jury the construction of the contract.   As the contract was in writing it was for the Court, and not the jury, to construe it, but beyond that we do not think there was any evidence to show that the appellee was a customer within the meaning of the contract.    It is true it had purchased some ice from the appellant, but before it made the arrangements with the Sumwalt Company it had been notified by the Knickerbocker Company that it would not furnish the ice unless the plaintiff purchased all it needed from that company, which it was not willing to agree to, until it was forced to do so.    The appellant can scarcely claim that when the contract of June 30th was made, there was already an existing contract between it and the appellee.    The defendant's fourth prayer is disposed of by what we have said about the plaintiff's second.    It should have been granted.

This brings us to the exceptions to testimony.    The first exception was to the admission of a receipted bill signed by

the Sumwalt Company for ice sold to the Gardiner Company on June 30th, 1906. We find no error in that ruling. Part of plaintiff's case was that it had a contract with the Sumwalt Company and this bill, identified by the treasurer and manager of the plaintiff, was some evidence tending to sustain that theory.

In the first bill of exceptions the evidence of Mr. Wilbourn, superintendent of the Gardiner Company, in reference to a telephone conversation with the Knickerbocker Company was admitted, subject to exception. He called up the company and inquired who was there and the party at the 'phone said the Knickerbocker Ice Company. He did not recognize the voice of the person talking. The man at the 'phone stated the price of the ice, said they had plenty of it and would let the plaintiff have it provided it gave them all its trade. The plaintiff got five or six loads that day (June 29), and all the orders were by telephone. He had his talks with the same person and in each case he got all the ice he ordered. The ninth exception was to the refusal to strike out that evidence.

In *Murphy* v. *Jack*, 142 N. Y. 215, which was an application to vacate an attachment, which had been issued on an affidavit made on information over the telephone, the Court said: "There would be no objection to the information having been conveyed through the medium of the telephone, if it had been made to appear that the affiant was acquainted with the plaintiff and recognized his voice; or if it had appeared, in some satisfactory way, that he knew it was the plaintiff who was speaking with him." In *Wolfe* v. *Mo. Pac. R. Co.*, 97 Mo. Ap. 473; S. C., 3 L. R. A. 539, it was held that a conversation by telephone between a witness and another person in the private office of a party is not inadmissibe because the witness does not identify the voice of the other person as that of the party or his clerk. BARCLAY, J., said: "When a person places himself in connection with the telephone system through an instrument in his office, he thereby invites communication, in relation to his business, through that channel. Conversations so held are as admissible in evidence as personal interviews

by a customer with an unknown clerk in charge of an ordinary shop would be in relation to the business therein carried on." See also *Mo. Pac. Ry. Co.* v. *Heidenheimer*, 82 Tex. 201; S. C. 17 S. W. 608; *Gen. Hospital Soc.* v. *N. H. Rendering Co.*, 79 Conn. 581; S. C. 65 A. 1065; *Kan. City Star Co.* v. *Standard Warehouse Co.*, 99 S. W. 765 (Mo.); *Godair.* v. *Ham. Nat. Bank*, 225 Ill. 572; S. C., 80 N. E. 407; *Jones on Ev.*, sec. 210; *Wigmore on Ev.*, sec. 2155. The latter says, "No one has ever contended that if the person first calling up is the very one to be identified, his mere purporting to be A is sufficient, any more than the mere purporting signature of A to a letter would be sufficient (*ante*, sec. 2148). The only case practically presented therefore is that of B's calling up A and being answered by a person purporting to be A. There is much to be said for the circumstantial trustworthiness of mercantile custom (*ante*, sec. 95), by which, in average experience, the numbers in the telephone directory do correspond to the stated names and addresses, and the operators do call up the correct number, and the person called does in fact answer. These circumstances suffice for some reliance in mercantile affairs; and it would seem safe enough to treat them in law as at least sufficient evidence to go to the jury, just as testimony based on prices—current is received (*ante*, sec. 719). This view has received some judicial support." The author then goes on to consider the case where the anti-phonal speaker does not purport to be a *particular person*, but merely some member of the office staff authorized to make a contract or an admission, and added: "On the principle above suggested (though not with the same force) mercantile experience may well suffice, by which customarily the person who is in fact summoned to the telephone and proceeds to conduct the negotiation is *prima facie* a person authorized to do so, precisely as a person receiving money at the cashier's desk is presumably authorized to do so. Upon this point there is little judicial inclination to take the liberal view."

There have since been other decisions, such as those cited above, which do adopt that view, and we think correctly.

As it is a character of evidence that might be used improperly, Courts should be careful in the application of the rule. In this case we have no difficulty in sustaining the rulings of the lower Court. The second bill of exceptions shows that that evidence was offered subject to exception—the expression of the Judge that "I will observe the same ruling that I made before" could have no other meaning when it is considered in the connection in which it is used. As there was subsequently no motion to strike it out there is nothing for us to rule upon. *Basshor & Co.* v. *Forbes,* 36 Md. 154; *Flack's case,* 88 Md. 368.

The third and fourth relate to the contract between the Sumwalt Company and the appellee. There was no question about the identification of the parties who used the telephone in those instances, and the parties themselves were on the stand. Nor can there be any doubt about the admissibility of the evidence in the fifth, sixth, seventh and eighth bills of exception. The ninth contains the motion to strike out the evidence of Charles G. Wilbourn, but we think that is clearly admissible under the rule announced in *Wolfe* v. *Mo. Pac. Ry. Co., supra,* which is sustained by the other authorities cited.

The only part of it that there could be any question about was when he spoke of being called up later in the afternoon, but that was wholly immaterial, as he simply told him that he had not taken the matter of the contract up with Mr. Gardiner. We would, however, have no difficulty about that if we treated it as properly before us, as Mr. Wilbourn testified that it was the same voice as that of the person with whom he had the previous conversations, and as that party was the one through whom the ice was ordered of the Knickerbocker Company, which was delivered, it was sufficient evidence of being someone authorized to act for that Company. It follows from what we have said that the judgment must be reversed for error in granting the plaintiff's second prayer and rejecting the defendant's fourth.

*Judgment reversed and new trial awarded, the appellee to pay the costs.*