831 A.2d 49

**Richard M. KASER**

v.

**FINANCIAL PROTECTION MARKETING, INC., et al.**

Misc. No. 1, Sept. Term, 2002.

Court of Appeals of Maryland.

Aug. 28, 2003.

Roderick R. Barnes (Ferguson, Schetelich & Ballew, P.A., on brief), Baltimore, for appellant.

Marta D. Harting (Robert J. Mathias, Piper Rudnick, LLP, on brief), Baltimore, for appellees.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

ELDRIDGE, J.

This is a Certified Question case pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 2002 Repl.Vol.), §§ 12–601 through 12–613 of the Courts and Judicial Proceedings Article and Maryland Rule 8–

305.[1]  The United States District Court for the District of Maryland has certified a question concerning the tort of wrongful interference with business relationships.  The certified question of Maryland law is as follows:

> "Does an insurance subagent (or broker) have an economic relationship with his client, the insured, separate from the insurance policy issued to the client, with which the insurer or the insurer's agent can interfere?"

Our answer to the question shall be "no."

## I.

The relevant facts are set forth in the United States District Court's Certification Order and the amended complaint which was incorporated into the Certification Order.  They are, in pertinent part, as follows:

> "This is a diversity case, in which the plaintiff, an insurance agent and broker, seeks relief from the defendants, marketers of insurance, for alleged tortious interference with the economic relationship between himself and his client, who had been issued an insurance policy through the defendants.

> "Given the fact that this case presents a novel question of state law which is determinative of the cause, this Court deemed it appropriate for certification to the Court of Appeals of Maryland. . . . The facts to be stated . . . are those set out in the preceding paragraph, as well as the allegations of the plaintiff's complaint, given that the question of law presents itself in the context of a motion to dismiss, when all facts alleged in the complaint must be taken as true.  (A copy of all relevant portions of the complaint is annexed hereto and incorporated herein by reference.)

---

1.  For a recent review of the Maryland Uniform Certification of Questions of Law Act, *see Piselli v. 75th Street Medical,* 371 Md. 188, 808 A.2d 508 (2002).

"For the purpose of this certification, the Court designates the plaintiff as appellant and the defendant as appellees.

\*　　\*　　\*

"Richard M. Kaser, Plaintiff, ... files this Amended Complaint against Protective Life Insurance Company, Financial Protection Marketing, Inc., James E. Hughes, and Insurance Investment Corporation, Inc., Defendants, and states:

\*　　\*　　\*

"2.　Plaintiff is an individual who resides and works in Baltimore County, Maryland. Kaser is an insurance agent and is licensed by the Maryland Insurance Administration.

"3.　Defendant Protective Life Insurance Company ('PLIC') is a stock life insurance company that has its principal place of business in Birmingham, Alabama. \* \* \* PLIC is licensed by the Maryland Insurance Administration to provide insurance services in the State of Maryland.

"4.　Financial Protection Marketing, Inc. ('FPM') is a corporation which was formerly located in Indianapolis, Indiana. FPM was a wholly owned and controlled subsidiary of PLIC and was consolidated into PLIC's Financial Institution Division. \* \* \* FPM is a licensed agent with the Maryland Insurance Administration.

"5.　Defendant James E. Hughes ('Hughes') is an individual who, upon information and belief, resides in Del Ray, Florida. Mr. Hughes is licensed as an agent within the State of Maryland by the Maryland Insurance Administration. At all times relevant hereto, Mr. Hughes was the President of FPM and Insurance Investment Corp. ('IIC').....

\*　　\*　　\*

"7.　Kaser is an independent insurance agent and broker who is in the business of procuring insurance for business clients, selling insurance, and matching businesses seeking insurance with businesses selling insurance. Kaser receives

a fee or commission as consideration for performing these services.

"8.  At all times relevant hereto, Chevy Chase Bank was and is involved in the business of lending money to persons who purchase automobiles under a special program (the 'Program') that allows them to pay only for the portion of the vehicle that they use.

"9.  A borrower who subscribes to the Program has several options at the end of the Program, including returning the vehicle to the dealer, who then sells it to a willing buyer.

"10.  If the loan balance of a returned vehicle exceeds the residual value of the vehicle at the time of sale, the lender will lose money.

"11.  Insurers learned of these losses and began to market residual value insurance that is intended to protect a lender such as Chevy Chase Bank from such losses.

"12.  Kaser has been involved in marketing residual value insurance across the country since the earliest development of the product, and had previously acted as an insurance agent for other Chevy Chase Bank interests.

"13.  In late 1998 or early 1999, Chevy Chase Bank executives contacted Kaser and asked him to locate residual value insurance to benefit the Bank."

"14.  Kaser knew that FPM marketed residual value insurance to other lenders.  FPM was wholly owned and controlled by PLIC. Kaser also knew that PLIC underwrote and marketed residual value insurance through its umbrella of companies.

"15.  Kaser contacted FPM executives and discussed the possibility of matching FPM with Chevy Chase Bank.

\*　　\*　　\*

"18.  In December 1999, a residual value insurance master policy was issued to Chevy Chase Bank through FPM by Interstate Fire and Casualty Co. \* \* \*

"19. On December 13, 1999, to coincide with the issuance of the Chevy Chase Bank residual value insurance master policy, Kaser entered into a Guaranteed Residual Investment Protection General Agent Agreement (the 'Agreement') with FPM. Pursuant to the Agreement, FPM designated Kaser as 'its General Agent for its insurance carrier' and promised to pay him a service fee in the amount of seven and one-half [percent] (7.5%) of the net written premiums arising out of residual value policies, such as the one issued to Chevy Chase Bank. Hughes negotiated, drafted, and executed the Agreement on behalf of FPM.

\* \* \*

"23. Upon information and belief, in September 2000, PLIC notified Hughes that he would be terminated effective January 1, 2001. Thereafter, with PLIC's blessing and encouragement, Hughes began to contact policyholders in an effort to have him named as agent of record, thereby entitling him to commissions. Chevy Chase Bank is one of the policyholders that he contacted.

"24. In and before December 2000, and unbeknownst to Kaser, Hughes contacted Larry Cain ('Cain'), Senior Vice President at Chevy Chase Bank, and solicited an appointment as agent of record on the account. Hughes' solicitation efforts involved making false and misleading statements about himself and Kaser. . . .

\* \* \*

"26. ... [O]n December 15, 2000, Hughes drafted a notice of termination of Agreement with Kaser. In the letter, Hughes advised Kaser that he had received an Agent of Record letter from Chevy Chase Bank changing the Agent of Record to IIC, but Hughes intentionally failed to disclose that he was the President of IIC and that no such Agent of Record letter was received by FPM. Hughes did not send this letter to Kaser until January 3, 2001, after he had ceased working for FPM. \* \* \*

"28. Kaser received the December 15, 2000, termination letter from Hughes shortly thereafter. When he confronted PLIC, it denied receipt of an Agent of Record letter....

"29.... Hughes drafted an Agent of Record letter for Chevy Chase Bank appointing himself and IIC as Agent of Record for Chevy Chase Bank. On January 18, 2001, Chevy Chase Bank executed the letter and forwarded it to PLIC.

"30.... PLIC then entered into an Agency Agreement with Hughes and IIC wherein it agreed to pay him a service fee of seventeen percent (17%) of the net written premiums on the Chevy Chase Bank account. This fee was approximately three times the fee that PLIC was paying to Kaser, yet Hughes was not expected to perform any services.

\* \* \*

"33. Hughes left the employ of PLIC and FPM on January 1, 2001."

In two subsequent counts in the amended complaint, the plaintiff Kaser alleged that both FPM and PLIC committed tortious interference with the plaintiff's economic relationship with Chevy Chase Bank. It was alleged in one of these counts that, "[a]t all times relevant hereto, Hughes's actions were committed while an employee of FPM and within the scope of his employment. Further, FPM ratified Hughes's actions and conduct with full knowledge of all material facts about his actions and conduct." The other count contained identical allegations with respect to PLIC. These are the counts giving rise to the certified question.

## II.

Maryland has long recognized the tort of interference with contractual or business relationships. *See, e.g., Medical Mutual v. B. Dixon Evander and Associates,* 339 Md. 41, 660 A.2d 433 (1995); *Alexander & Alexander, Inc. v. B. Dixon Evander and Associates,* 336 Md. 635, 650 A.2d 260 (1994); *Macklin v. Robert Logan Assocs.,* 334 Md. 287, 639 A.2d 112 (1994); *Travelers Indem. Co. v. Merling,* 326 Md. 329, 605 A.2d 83, *cert. denied,* 506 U.S. 975, 113 S.Ct. 465, 121 L.Ed.2d

373 (1992); *K & K Management v. Lee,* 316 Md. 137, 557 A.2d 965 (1989); *Sharrow v. State Farm Mut. Auto. Ins. Co.,* 306 Md. 754, 511 A.2d 492 (1986); *Vane v. Nocella,* 303 Md. 362, 383 n. 6, 494 A.2d 181, 192 n. 6 (1985); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 485 A.2d 663 (1984); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 424 A.2d 744 (1981); *Beane v. McMullen,* 265 Md. 585, 603, 291 A.2d 37, 46–47 (1972); *McCarter v. Baltimore Chamber of Commerce,* 126 Md. 131, 136, 94 A. 541, 542 (1915); *Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 80 A. 48 (1911); *Willner v. Silverman,* 109 Md. 341, 71 A. 962 (1909); *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 69 A. 405 (1908).

In *Natural Design, Inc. v. Rouse Co., supra,* 302 Md. at 69, 485 A.2d at 674, we explained that

> "the two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation."

The present case does not involve an allegation of wrongful interference with any one specific contract. Instead, the plaintiff Kaser complains of FPM and PLIC's alleged wrongful interference with the ongoing business relationship between Kaser and Chevy Chase Bank.

Almost one hundred years ago, this Court in *Willner v. Silverman, supra,* 109 Md. at 355, 71 A. at 964, cited with approval the case of *Walker v. Cronin,* 107 Mass. 555, 562 (1871), decided by the Supreme Judicial Court of Massachusetts, and held that the elements required to establish the tort of wrongful interference with contractual or business relations are as follows:

> " '(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss,

without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'"[2]

*See also Alexander v. Evander, supra,* 336 Md. at 652, 650 A.2d at 268–269; *K & K Management v. Lee, supra,* 316 Md. at 160, 557 A.2d at 973; *Natural Design, Inc. v. Rouse Co., supra,* 302 Md. at 71, 485 A.2d at 675.

Furthermore, "this Court has refused to adopt any theory of tortious interference with contract or with economic relations that 'converts a breach of contract into an intentional tort.'" *Alexander v. Evander, supra,* 336 Md. at 654, 650 A.2d at 269–270, quoting *K & K Management v. Lee, supra,* 316 Md. at 169, 557 A.2d at 981. *See also Alexander v. Evander, supra,* 336 Md. at 657, 650 A.2d at 271 ("wrongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships"); *Macklin v. Robert Logan Assocs., supra,* 334 Md. at 301, 639 A.2d at 119 ("To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct"); *Travelers Indemnity v. Merling, supra,* 326 Md. at 343, 605 A.2d at 90 ("For one to recover for tortious interference with contractual or economic relations, the interference must have been wrongful or unlawful").

In addition, "to establish causation in a wrongful interference action, the plaintiff must prove that the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference." *Medical Mutual v. Evander, supra,* 339 Md. at 54, 660 A.2d at 439. *See Alexander v. Evander, supra,* 336 Md. at 652, 650 A.2d at 269; *Macklin v. Robert Logan Assocs., supra,* 334 Md. at 301–302, 639 A.2d at 119 ("to be actionable, the improper or wrongful conduct must induce the breach or termination of the

---

2. For a discussion of the common law roots of this tort and its first appearance in the Maryland cases, *see Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 70 n. 11, 485 A.2d 663, 674 n. 11 (1984).

contract"); *K & K Management v. Lee, supra,* 316 Md. at 155, 557 A.2d at 973.

Turning to the issue in the case at bar, this Court has consistently taken the position that the tort of wrongful interference with economic relations will not lie where the defendant is a party to the economic relationship with which the defendant has allegedly interfered. *Alexander v. Evander, supra,* 336 Md. at 646 n. 8, 650 A.2d at 265 n. 8 ("[A] party to contractual relations cannot be liable for the interference tort based on those contractual relations. The tort is aimed at the person who interferes with the contract, and not at one of the contracting parties"); *Travelers Indemnity v. Merling, supra,* 326 Md. at 343, 605 A.2d at 89 ("For the tort to lie, the defendant tortfeasor cannot be a party to the contractual or economic relations with which he has allegedly interfered"); *K & K Management v. Lee, supra,* 316 Md. at 154–156, 557 A.2d at 973–974; *Natural Design, Inc. v. Rouse Co., supra,* 302 Md. at 69, 485 A.2d at 674; *Wilmington Trust Co. v. Clark, supra,* 289 Md. at 329, 424 A.2d at 754 ("we have never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract. Indeed, it is accepted that there is no cause of action for interference with a contract when suit is brought against a party to the contract"). *See also Medical Mutual v. Evander, supra,* 339 Md. at 58, 660 A.2d at 441 (concurring opinion) ("It is well established in Maryland that the tort of wrongful interference with contract or economic relationships does not lie where the defendant is a party to the contract or economic relationship allegedly interfered with").

The requirement that the defendant not be a party to the contract or business relations is traceable to the first case recognizing the tort of intentional interference with contract, the seminal English case of *Lumley v. Gye* [1853] 2 El. & Bl. 216, 118 Eng. Rep. 749, 22 L.J.Q.B. 463. In *Lumley,* the defendant persuaded an opera singer to breach her contract with the plaintiff's theater in order to perform at his theater instead. The plaintiff clearly had a breach of contract action against the opera singer; however he had no previously

recognized claim against the party who induced the breach. Nevertheless, a divided court recognized that the plaintiff had a cause of action against the third-party theater owner for intentional interference with contract.

Relying upon *Lumley*, this Court first recognized a cause of action for "wrongful interference with business relations" in the companion cases of *Knickerbocker Ice Co. v. Gardiner Dairy Co., supra*, 107 Md. 556, 69 A. 405, and *Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co., supra*, 114 Md. 403, 80 A. 48. These cases presented the classic three-party model required in tortious interference cases.

In the *Gardiner Dairy* and *Sumwalt Ice* cases, Knickerbocker Ice Co. entered into a contract to sell ice to the Sumwalt Company, an ice wholesaler, for $ 2.25 per ton. The contract also provided that Sumwalt "would not . . . interfere with the customers or trade" of the Knickerbocker Company. Subsequently, Sumwalt contracted to sell ice to the Gardiner Dairy Company, a retailer, at $ 5.00 per ton. Knickerbocker subsequently threatened to withhold all future deliveries of ice from Sumwalt if it continued to sell ice to Gardiner Dairy. Since there were few other ice manufacturers in the area, Sumwalt took heed of the threat and broke its contract with Gardiner Dairy, causing the retailer to purchase its ice directly from Knickerbocker at a higher price. Gardiner Dairy sued Knickerbocker for intentionally interfering with the retailer's contract with Sumwalt. This Court decided that Knickerbocker could be held liable in tort to Gardiner Dairy. *See Gardiner Dairy, supra*, 107 Md. at 568, 69 A. at 409. Three years later, in the *Sumwalt Ice* case, the Court held that the Sumwalt Company could also sue Knickerbocker for the same act of interference, since Sumwalt was also damaged by Knickerbocker's improper conduct which induced the breach of the contract between Sumwalt and Gardiner Dairy. *See Sumwalt Ice, supra*, 114 Md. at 416–418, 80 A. at 50–51.

In both of these companion cases, the parties to the contract being interfered with were Sumwalt and Gardiner Dairy, and the "interferer" was Knickerbocker. In the *Gardiner Dairy*

case, the buyer's action against the interferer was recognized; in the *Sumwalt Ice* case, the seller's suit against the interferer was recognized.[3] The fact that Sumwalt had a separate contract with Knickerbocker was irrelevant to determining whether Sumwalt could assert a tort action against Knickerbocker for interference with the Sumwalt Gardiner Dairy contract. Moreover, while it was true that Gardiner Dairy had a viable breach of contract action against its contracting party, Sumwalt, it was equally clear that Gardiner Dairy did not have a tortious interference action against Sumwalt, since Sumwalt was a party to the contract being interfered with.

We specifically addressed the effects of a breached contract upon a contracting party's business relationships with third parties in *K & K Management v. Lee, supra,* 316 Md. 137, 557 A.2d 965. In that case, K & K Management, operators of the Harbor City Inn, signed a lease with Chul Woo and So Ja Lee to run the inn's restaurant. Under the terms of the lease, K & K retained the right, *inter alia,* to establish general operating standards, to manage every phase of the restaurant's operation, and to terminate the agreement immediately if the Lees incurred any financial obligations or liability to K & K. The agreement was also terminable with thirty days written notice if the Lees failed to meet K & K's operating standards.

The Lees operated the restaurant for about two years. During that time, K & K sent the Lees several letters expressing displeasure over the management of the restaurant. K & K asserted it could terminate the agreement immediately, because the Lees had caused K & K to incur the liability of a potential lawsuit. Ultimately, K & K resorted to self-help by changing the locks on the doors of the restaurant rather than sending a thirty-day termination notice to cancel the contract. The Lees filed suit against K & K claiming, *inter alia,* intentional interference with the business relations

---

**3.** Of course, it will not always be the case that both parties to the breached contract will have a cognizable tort claim against the interferer. The situation in the *Gardiner Dairy* and *Sumwalt Ice* cases was unusual.

between the Lees and their customers and suppliers. The jury rendered a verdict in favor of the Lees on all counts. Over $750,000 of the damages awarded by the jury resulted from the intentional interference tort claim. K & K appealed, arguing that even an intentional breach of contract by a promisor, such as K & K, could not give rise to a cause of action in the promisee for tortious interference. K & K maintained that the breach's incidental effects on business relationships between the Lees and their customers and suppliers was limited to and exclusively remedied by the contract damages suffered by the Lees.

This Court reversed the judgment on the tortious interference count, holding that K & K did not tortiously interfere with the business relations between the restaurant operators and their suppliers and customers. Judge Rodowsky for the Court stated as follows (316 Md. at 154, 557 A.2d at 973):

> "Tortious interference with business relationships arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer (D)."

Judge Rodowsky then distinguished this three-party interference tort scenario from a two-party breach of contract scenario, 316 Md. at 155–156, 557 A.2d at 974:

> "A two party situation is entirely different. If D interferes with D's own contract with P, D does not, on that ground alone, commit tortious interference, and P's remedy is for breach of the contract between P and D. This Court has 'never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract.' *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744, 754 (1981). *See also Continental Casualty Co. v. Mirabile*, 52 Md.App. 387, 402, 449 A.2d 1176, 1185, *cert. denied*, 294 Md. 652 (1982). *Wilmington Trust* cited numerous federal and state court decisions in support of its holding that 'there is no cause of action for interference with a contract when suit is brought against a party to the contract.' 289 Md. at 329,

424 A.2d at 754. *See also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* 990 (5th ed. 1984) ('The defendant's breach of his own contract with the plaintiff is of course not a basis for the tort.')."

Although the Court ultimately decided the case based on the insufficiency of the evidence regarding K & K's improper purpose, the Court reasoned, 316 Md. at 158–159, 557 A.2d at 975, that

"acts have multiple effects. D's breach of contract with P can interfere with P's business relations with T. Whether that effect is tortious interference with the P T relationship depends in large measure on whether D's purpose or motive in breaching the D P contract is to interfere with the P T relationship. * * * [T]here is no tort because the evidence is uncontradicted that [K & K's] purpose or motive in closing the restaurant was not directed at the Lees' relations with their customers."

The Court also considered whether a separate tort recovery for the breach's incidental effects on the business relationships between the Lees and their customers and suppliers was cognizable or whether the Lees were limited to breach of contract damages. After noting that the Lees' business relationships with their customers were entirely dependent upon the contract between K & K and the Lees, the Court stated (316 Md. at 162–163, 557 A.2d at 977):

"Any claim of tortious interference with the Lees' business relations with [their] customers is indistinguishable from the breach of the Agreement and has been compensated by damages measured by lost profits for the life of the Agreement. * * * The Lees' loss of that business ... was an incidental effect of [K & K's] breach of the Agreement and not the object or purpose of the breach."

The issue of whether a contracting party may bring a tortious interference action against the breaching party was also present in *Travelers Indem. Co. v. Merling, supra,* 326 Md. 329, 605 A.2d 83. The *Merling* opinion adopted the same analytical framework applied in *K & K Management v. Lee.* In

that case, Mr. Merling, an insurance agent, alleged that, by wrongfully terminating him, the insurer had tortiously interfered with the economic relationships between the agent and his clients, the insureds. Thus, Merling contended that "[t]he contract here interfered with is the personal services contract between the independent agent and his client, rather than the contract of indemnity issued by the insurer." *Merling, supra,* 326 Md. at 343, 605 A.2d at 90. The Court's resolution was ultimately based upon the absence of any wrongful or unlawful conduct by the insurer, with the Court assuming, *arguendo,* that there existed contracts between the agent and the insureds which were independent of and separable from the insurance policies and that the insurer had interfered with those contracts. Nevertheless, the Court stated (326 Md. at 343, 605 A.2d at 89):

> "Merling appears to recognize that, to the extent that the contractual or economic relations among the clients, Merling, and Travelers are reflected in the insurance policies, Travelers cannot be guilty of the tort of wrongful interference with contractual or economic relations because it is a party to the insurance policies. For the tort to lie, the defendant tortfeasor cannot be a party to the contractual or economic relations with which he has allegedly interfered."

The issue was also raised in *Medical Mutual v. Evander, supra,* 339 Md. 41, 660 A.2d 433, where an insurance agent brought a wrongful interference suit against an insurer, alleging that the insurer's post-termination letter to the insureds contained defamatory language, which ultimately caused the interference with the agent's business relationships with the insureds. Although this Court's decision in favor of the insurer was based on lack of causation, a concurring opinion also pointed out that the tort probably would not lie under the principles set forth in *Travelers Indem. Co. v. Merling, supra,* and *K & K Management v. Lee, supra.* The concurring opinion observed that the agent's position "arguably converts into a three-party situation every two-party relationship in which one party is represented by an agent." *Medical Mutual v. Evander, supra,* 339 Md. at 61, 660 A.2d at 443.

This Court rejected such a view of the tort in *K & K Management v. Lee, supra,* 316 Md. at 170–171 n. 14, 557 A.2d at 981 n. 14, where we stated:

> "[W]e reject an analysis under which corporate officers, agents or employees, acting on behalf of a corporation within the scope of their authority, are viewed as actors ... separate from their corporation ... and thereby can maliciously interfere with business relations between their corporation ... and the plaintiff."

The concurring opinion in *Medical Mutual v. Evander, supra,* 339 Md. at 62–63, 660 A.2d at 442 (footnote omitted), also pointed out that the business relationships among the agent, the insureds, and the insurer Medical Mutual were not independent, but rather

> "were bound up in the policies of insurance issued by Medical Mutual. * * * Moreover, because the plaintiffs derived their income from commissions for the business they procured, the economic losses which the plaintiffs claimed to have suffered as a result of the Medical Mutual's allegedly tortious interference were the lost commissions that Medical Mutual would have paid on the basis of insurance policies issued to the plaintiffs' clients. Under these circumstances, it is questionable that the three-party situation which forms the predicate of a wrongful interference action exists in the present case. If Medical Mutual was a party to the business relationships between the plaintiffs and their clients insured with Medical Mutual, it may be doubtful, as a matter of law, that it could be held liable for tortiously interfering with business relationships between the plaintiffs and their Medical Mutual insureds."

This echoed the Court's reasoning in *K & K Management v. Lee, supra,* 316 Md. at 162, 557 A.2d at 977, that, since the relationship between the Lees and their customers was entirely dependent upon the contract between K & K and the Lees, "[a]ny claim of tortious interference with the Lees' business relations with [their] customers is indistinguishable from the breach of the Agreement and has been compensated by damages measured by lost profits for the life of the Agreement."

### III.

■ The certified question in this case is whether an independent relationship existed between Kaser, a subagent, and Chevy Chase Bank, an insured, which was *separate from* the insurance policy issued to Chevy Chase Bank through FPM, the general agent, such that FPM could tortiously interfere with that relationship. Thus, our focus is on the three-party requirement of the interference tort.

There is no question that FPM's decision to enter into a Master Agreement with Hughes as Agent of Record affected Kaser's relationship with Chevy Chase Bank. Having chosen to substitute Hughes as its newly designated Agent of Record, however, Chevy Chase Bank indicated to FPM that it no longer wished to deal with Kaser as an intermediary. Thus, the *triggering* event, which caused the effective termination of Kaser and the alleged consequent "interference" with Kaser's "economic relationship" with Chevy Chase Bank, was the bank's execution of the Agent of Record letter appointing Hughes and IIC as Agent of Record on January 18, 2001. Nevertheless, Kaser urges that these actions were taken by Chevy Chase upon prompting by Hughes and that "[a]t all times relevant hereto, Hughes's actions were committed while an employee of FPM and within the scope of his employment. Further, FPM ratified Hughes's actions and conduct with full knowledge of all material facts about his actions and conduct."

The plaintiff Kaser alleges that, by allowing the substitution of Hughes as Agent of Record, FPM tortiously interfered with the economic relationship between Kaser, as the subagent, and Chevy Chase Bank, the client. Kaser asserts that "Maryland's recognition of an insurance agent's right to his expirations implicitly recognizes a separate economic relationship between the subagent and the insured." [4] In *Travelers In-*

---

4. The term "expirations" is a term of art in the insurance industry. It is a term used for the bundle of information regarding a client including, for instance, a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of the insurance premiums, property

*dem. Co. v. Merling, supra,* 326 Md. 329, 605 A.2d 83, however, where the agent alleged conversion of his expirations as well as tortious interference with the "personal services contract" between himself and his insureds, this Court treated the two counts separately, declining to hold that an agent's right to his expirations established a separate economic relationship with which the insurer tortiously interfered. In *Merling,* we noted that the agent's common law right to expirations was not absolute and had been modified by statute. Unlike the agent in *Merling,* Kaser does not even allege that his expirations were appropriated by FPM or any other party. We perceive no basis to imply, for purposes of the wrongful interference tort, a separable economic relationship between an insured and a subagent which is founded upon the subagent's common law right to expirations. To do so would allow an interference tort recovery in most breach of contract actions involving an insurance agent or subagent. This would undermine our consistent holdings which decline to convert a mere breach of contract into a wrongful interference tort.

If any separate and independent economic relationship existed between Chevy Chase Bank and Kaser's agency, it predated the insurance contract between FPM and Chevy Chase Bank allegedly being interfered with. The alleged facts reveal that in late 1998 or early 1999, Chevy Chase Bank executives contacted Kaser and asked him to procure residual value insurance to benefit the bank. The performance of that service by Kaser was completed in full when Kaser matched the bank's need with FPM's desire to furnish residual value insurance for Chevy Chase Bank.

Once the residual value insurance master policy was issued by the insurer through FPM, FPM was a party to the insurance relationship with Chevy Chase Bank. From that point forward, the relationship that Kaser had with Chevy

---

covered, and terms of insurance. For a more detailed discussion of the term, *see Travelers Indem. Co. v. Merling,* 326 Md. 329, 337, 605 A.2d 83, 86–87, *cert. denied,* 506 U.S. 975, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992).

Chase Bank was entirely dependent upon and bound up with the contractual relationship between the insurer, through FPM, and Chevy Chase Bank. After Chevy Chase Bank entered into the master policy with the insurer, the allegations of the complaint do not disclose any relationship between Chevy Chase Bank and Kaser on any matters which were separate from and independent of this master policy and with which the defendants interfered. Pursuant to the terms of the Guaranteed Residual Investment Protection General Agent Agreement executed by Kaser and FPM, FPM paid Kaser a "service fee" in the amount of 7.5 percent of the premiums arising out of residual value policies, such as the one issued to Chevy Chase Bank. As soon as Kaser procured a suitable residual value insurance provider for Chevy Chase Bank, the connection between Kaser and the bank was entirely bound up with the primary relationship among the insurer, FMP, and Chevy Chase Bank.

The certified question is answered by the well-established Maryland rule that, for the tort of wrongful interference with economic relations to lie, the defendant tortfeasor cannot be a party to the economic relationship with which the defendant has allegedly interfered. *See, e.g., Travelers Indem. Co. v. Merling, supra,* 326 Md. at 343, 605 A.2d at 89; *K & K Management v. Lee, supra,* 316 Md. at 154–156, 557 A.2d at 973 974; *Sharrow v. State Farm Mutual, supra,* 306 Md. at 763, 511 A.2d at 497; *Natural Design, Inc. v. Rouse Co., supra,* 302 Md. at 69, 485 A.2d at 674; *Wilmington Trust Co. v. Clark,* 289 Md. at 329, 424 A.2d at 754. Consequently, the certified question is answered in the negative.

*THE CERTIFIED QUESTION IS ANSWERED AS SET FORTH ABOVE. PURSUANT TO THE CERTIFICATION ORDER AND § 12–610 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE, THE COSTS SHALL BE EQUALLY DIVIDED BETWEEN THE APPELLANT AND THE APPELLEES.*